# MARCH, 1939.

Louis J. Brody, Respondent, v. Cudahy Packing Company, et al., Appellants.—127 S. W. (2d) 7.

Kansas City Court of Appeals. March 6, 1939.

974

*O. Q. Claflin* and *Henry L. Jost* for appellants.

976

*Myer M. Rich, Isadore Rich* and *Mosman, Rogers, Bell & Buzard,* for respondent.

KEMP, J.—This is a suit for personal injuries alleged to have been suffered by plaintiff from falling into an uncovered chute at the plant of defendant Cudahy Packing Company, on October 30, 1936, at about five o'clock in the morning. Upon a trial of the case, respondent (hereinafter referred to as plaintiff) recovered judgment against the appellants (hereinafter referred to as defendants) in the sum of $5000, from which judgment the defendants have duly prosecuted this appeal. At the time of his injury, plaintiff was, and for thirty years prior thereto had been, following the occupation or profession of a Kosher slaughterer. For eighteen years prior to the herein described injury, plaintiff had been employed in that capacity by the Kosher Star Butchers Association. His duties under said employment required plaintiff to go to the various packing plants in Greater Kansas City, as from time to time directed, and there slaughter cattle and sheep, and once in every seventy-two hours following the slaughtering of an animal, washing the forequarters thereof for the period that the meat remained at the packing plant, all in accordance with the recognized practice of the Orthodox Jewish faith. He was also required to go to the shops and stores of members of the Kosher Star Butchers Association for the purpose of slaughtering poultry there.

From the time he began to slaughter animals at the plant of defendant Cudahy Packing Company, in 1935, he went there, usually, once a week for the purpose of slaughtering animals, and on the weeks that he did slaughtering at said plant, he usually went there twice a week for the purpose of washing meat hanging in the plant cooler and reserved for the Kosher trade, in accordance with Orthodox Jewish practice. For all of the work he did at the various packing plants and Kosher shops, he was paid by the Kosher Star Butchers Association, by a single weekly check, a salary of $67 per week, $55 of which was for the slaughtering of animals and poultry, and $12 per week for the washing of the meat.

The Kosher shopkeepers, who are members of the Kosher Star Butchers Association, pay dues to the association to provide funds with which to operate the business of the association. It further

appears that the defendant company made certain payments to the association, but the record is silent as to the amounts and as to times of these payments, and as to the purpose for which they were made. So far as the record discloses, the payments made by the packing company to the association bore no direct relationship either to the salary paid to plaintiff by the association or to the work done by plaintiff in defendant company's plant.

The Feinberg Kosher Sausage Company was engaged in the wholesale trade of koshered meats and sold koshered meats to the retail Kosher meat shops in Kansas City, including members of the Kosher Star Butchers Association. Some time in 1935, and more than a year prior to the accident in question, accompanied by plaintiff, Mr. Feinberg, the head of the Feinberg Kosher Sausage Company, went to the Cudahy Packing Company plant and there made arrangements with Cudahy Packing Company to supply the Feinberg company with koshered meats, the slaughtering of which, pursuant to said arrangement, was to be done by plaintiff in accordance with the Orthodox Jewish requirements, which included the killing of the animal by cutting its throat, a manual inspection of certain internal organs of the animal and washing the fore quarters of the carcass within regular 72-hour intervals following the slaughtering, and during the period the meat remained in the packing house.

Plaintiff's work, as herein described, was supervised by a Jewish Rabbi (Rabbi Braver). No official, superintendent, foreman or other employee of the Cudahy Packing Company ever supervised or directed plaintiff as to how he should do his work or attempted to exercise any direction or control over any of the work or services performed by him at the defendant company's plant. In this connection, it should be noted that a part of a Kosher slaughterer's duties is to cut a slit in the body of the animal, through which the Kosher slaughterer inserts his hand and makes a manual examination of certain internal organs of the animal to ascertain whether the animal meets the requirements for Kosher meat. The evidence in this case discloses that *the plaintiff had the right to reject any animal that failed, in his opinion, to meet the requirements for Kosher meat.*

On October 30, 1936, at about five o'clock in the morning, and before it was yet daylight, plaintiff went to the defendant company's plant to wash the meat reserved for the Kosher trade, which was hanging in the cooling room. Plaintiff never observed any regular hours of the day for performing the duty of washing the meat, but did it at any time convenient to himself, usually at hours when the plant was not in operation, of which fact those in charge of the defendant company's plant were aware. On the occasion in question he went to the plant at this hour because at nine o'clock of this day he "had to go to work in another packing house to do the slaughtering." He was let into the plant by a company employee, where-

upon he went via stairways to the fifth floor, on which floor level the cooling room was located. From the stairway door on the fifth floor he started to walk eastwardly to a bucket rack to get a water bucket to use in the washing of the meat. Between the door and the bucket rack is what is referred to in evidence as the "retain room," which in fact is not a room at all but a space enclosed by a concrete curbing six inches in height above the level of the floor. This retain "room" was space where questioned meat was sent for final inspection by United States Government inspectors for final determination as to whether or not it was suitable for human consumption. Inside this space, at one corner and within two or three inches of this curbing, was a metal pipe or chute sixteen inches in diameter, the top of which extended up six inches above the level of the floor, thus putting it at the same level as the top of the curbing about this space. The curbing on the north side of this space runs diagonally, so that the corner of the space where the chute is located has the effect of extending out into the path which plaintiff was pursuing on his way to the bucket rack. The place was dimly lighted by a single small light at the south wall some distance away and to a slight extent by natural light. As plaintiff reached the corner of the space thus enclosed by the curbing, he stepped or fell with his right foot and leg into this open chute, the cover of which had been left off, falling through to his crotch, and was thereby injured. At the time of said injury, there was available for covering this metal chute or pipe, a milk can type cover. This type cover had no permanent attachment to the pipe or chute and could be completely removed therefrom without any remaining contact with the pipe. Subsequent to this accident, the milk can type cover was discarded and a hinged cover was substituted therefor, so that when the chute was opened the covering would remain attached by the hinge to the side of the chute.

While this space constituting the "retain room" was used by United States Government inspectors for the purpose above described, defendant company's employees were charged with the duty of keeping the space clean, including the pipe or chute through which all condemned meat was dropped and carried to the sealed "condemn room" on the floor below. This "condemn room" was under the supervision of the United States Government inspectors.

Disregarding the precise order in which made in their brief, defendants urge the following points, to-wit:

(1) At the time and place of plaintiff's injury, plaintiff was a bare licensee, using defendant company's packing house premises for his own purposes and pecuniary profit and engaged in an act entirely unconnected with and unrelated to defendant Cudahy Packing Company's business.

(2) If plaintiff was other than a mere licensee, then he was an

employee of the defendant company and any right to compensation for his alleged injuries is exclusively under the provisions of the Kansas Workmen's Compensation Act.

(3) The particular place where plaintiff was injured was under the exclusive control and use of officers of the United States Government, and the plaintiff cannot recover because, (a) the place of injury was a space outside of the area of plaintiff's alleged invitation to use the plant premises, and (b) plaintiff was injured in Government territory.

(4) Plaintiff was guilty of contributory negligence as a matter of law, and hence is not entitled to recover.

(5) The evidence does not make out a case for the jury, and defendants' demurrers to the evidence should have been sustained.

(6) This appeal involves a Federal question and the cause should therefore be transferred from this court to the Supreme Court of Missouri.

The first question presented here for determination is whether plaintiff, at the time of his injury, was on the particular premises where he was injured as an invitee, as alleged by plaintiff in his petition, or as a licensee, as contended by defendants. The importance of this question lies in the difference in the duty owed by an owner or occupier of premises to an invitee, and that owed to a mere licensee. It is defendants' contention that, "Plaintiff cannot recover in this action as against defendant Cudahy Packing Company because at the time and place he was injured, he was a bare licensee using said defendant's packing house and premises for his own purpose and pecuniary profit, and engaged in an act entirely unconnected with and unrelated to defendant Cudahy Packing Company's business." If plaintiff was a mere licensee at the time and place he was injured, then defendants are correct in their contention that "plaintiff entered on and used defendant Cudahy Packing Company's premises at his own risk and the only duty said defendant owed him at the time and place whilst he was so engaged was to refrain from actively, intentionally and wilfully injuring him." As was said in *Menteer v. Scalzo Fruit Co.*, 240 Mo. 177, a licensee "may complain of wanton or intentional injuries, or active negligence, but not that the place was not safe." In the case of *Shaw v. Goldman*, 116 Mo. App. 332, 92 S. W. 165, 1. c. 167, the rule as to the duty owed a licensee is stated as follows:

"It is abundantly established that one who enters upon the premises by permission only, without invitation, enticement, or allurement held out to him by the occupier or owner or some representative thereof, enters there, at the very best, by mere permission, becoming a licensee only and enjoys the license at his own risk, or, as it has been well said, he enjoys the license with its concomitant perils and takes upon himself whatever risk from pitfalls or other obstructions that

may attend such merely permissive entry, and in such case no duty is imposed by law upon the owner. or occupier to keep the premises in a suitable condition for those who go there solely for their own convenience or pleasure or to satisfy their curiosity.''

This language was quoted approvingly in the case of *Ford v. Rock Hill Quarries Co.*, 111 S. W. (2d) 173. Defendants cite a great array of authorities announcing this rule of law as to the duty, or lack of duty, to a licensee. However, since there is no dispute as to this proposition of law, there is no occasion for any particular reference to the numerous cases cited by defendants in support thereof.

The rule of law applicable to the duty of an invitee is equally well-settled. By the undoubted weight of authority in this country, it is held that the owners or those in control of premises to which a person has been invited, owe a duty to that person to see that such premises are in a reasonably safe condition for the exercise by the invitee of the invited use. The distinction between the duty owed to a licensee and the duty owed to an invitee is clearly set forth in the case of *Foster Lumber Co. v. Rodgers* (Texas), 184 S. W. 761, wherein the court reviews and comments upon the statements of the rule by various courts and text-book writers. At page 767 of the opinion, the following language appears:

''In Plummer v. Dill, 156 Mass. 426, 31 N. E. 128, 32 Am. St. Rep. 463, the Supreme Court of that State fixes the rule thus: One who goes on the premises of another for his own convenience, or pleasure, or matters which concern him alone, even though by permission of the owner of the premises, is a licensee and the owner of the premises owes him no duty other than to not wilfully or maliciously injure him; but one who goes upon the premises of another by the invitation of the owner of the premises, either express or implied, in the performance of work mutual to the interest of the person going upon the premises, the owner of the premises owes him the duty of keeping such premises in a reasonably safe condition for his use while performing such work.

. . . . . . .

''Mr. Cooley, in his splendid work on Torts (3 Ed.), Vol. 2, p. 1258, says:

'' 'It has been stated on a preceding page that one is under no obligation to keep his premises in safe condition, for the visits of trespassers (citing many authorities). On the other hand, when he expressly or by implication invites others to come upon his premises, whether for business or any other purpose, it is his duty to be reasonably sure that he is not inviting them into danger, and to that end he must exercise ordinary care and prudence to render the premises reasonably safe for the visit.'

''Again, on page 1265, this able author says:

'' 'An invitation may be inferred when there is a common interest

of mutual advantage, a license when the object is the mere pleasure or benefit of the person using it. A United States revenue officer assigned a duty in a distillery and required to visit all parts of same daily, is there at the implied invitation of the owner—citing Anderson & Nelson Dis. Co. v. Hair, 103 Ky. 196, 44 S. W. 658.' ''

We now pass to an examination of the facts to determine whether or not the evidence would support a jury's finding that the plaintiff was an invitee. The jury having found in favor of the plaintiff, then in support of this verdict we must hold that plaintiff was an invitee rather than a licensee if there be sufficient evidence to warrant such a finding.

The evidence discloses that in 1935, and more than a year prior to plaintiff's injury, plaintiff accompanied Mr. Feinberg of the Feinberg Kosher Sausage Company to the Cudahy Packing Company plant and there made an arrangement with a representative of the defendant company for that company to furnish the Feinberg company with Kosher meats. In order to achieve this purpose, it was necessary that the meat so to be supplied to the Feinberg company should be slaughtered pursuant to the Orthodox Jewish ritual and by a person duly authorized as, and following the trade or profession of, a Kosher slaughterer. Referring to the conversation between Mr. Feinberg, on the one hand, and Mr. Conron, acting on behalf of the packing company on the other, plaintiff testified that Mr. Conron ''took me as the man who was being in charge of the Kosher slaughterers.'' Pursuant to that arrangement, the plaintiff thereupon began going to the plant approximately once a week to perform his work as a Kosher slaughterer. The scope and character of this work we have heretofore set out. Unquestionably, the arrangement which involved plaintiff's presence at the defendant plant as a Kosher slaughterer was made on the part of the defendant packing company with a view to profit from the sale of Kosher meats. It seems clear to us, therefore, that plaintiff's presence at the plant in performance of his duties as a Kosher slaughterer was not for his exclusive advantage or profit, but was for the mutual advantage and profit of himself and the defendant company. Absent the slaughtering work done by plaintiff, defendant company could not avail itself of the benefits arising from the sale of Kosher meat. Defendants, in their brief, state that, ''It is conceded that if, at the time and place of his injury, he was engaged in doing something of mutual advantage and profit to himself and defendant packing company, and doing it with the permission and consent of the packing company, he would be an invitee; but if the act in which he was engaged, and his use of defendant packing company's premises in that connection, were altogether for his own convenience, advantage, benefit and profit and was not connected with or related to defendant's business, and an act which did not benefit the defendant and from which it derived no

profit, then he was not an invitee but a licensee to whom defendant packing company owed no duty except to refrain from wilfully and intentionally injuring him.'' Certainly, as to plaintiff's presence in the plant premises at the place where the actual killing of the animals was performed, the plaintiff was an invitee. Defendants, however, contend that even though plaintiff was an invitee as to the place on defendant company's premises where the animals were killed, he was only a licensee at the place where he was injured. In support of their contention, defendants urge that at the time plaintiff was injured, he was not performing any duties as a Kosher slaughterer, but was, at the particular time of the injury, engaged in services entirely distinct from his duties as a slaughterer and was there solely for his own advantage, benefit and profit: In other words, defendants contend that if plaintiff was an invitee at all, he was an invitee only for the purpose of actually killing the cattle pursuant to the Jewish Orthodox ritual, and that the washing of the meat in which plaintiff was engaged at the time of the injury was entirely distinct from and independent of the purpose for which he was invited (if invited at all) to defendant company's plant. The facts do not warrant this contention. The whole purpose of plaintiff's presence at any time at the plant was to perform services of a peculiar character which would enable the defendant to furnish meat conforming to qualifications essential to the Kosher trade. The washing of the meat within regular intervals of 72 hours following the slaughtering thereof was just as essential to qualifying it for the Kosher trade and to maintaining its character as Kosher meat, as was the particular manner of killing the animal and the manual examination of certain internal organs of the animal. The killing, the examination and the washing were all a part of the ritual essential to the production of Kosher meat and the preservation of same as Kosher meat. Furthermore, the defendant and its agents were fully aware of the practice in its entirety. Plaintiff testified that meat that was slaughtered on any given day was not washed on the same day. Plaintiff sometimes washed the meat in the daytime but usually performed this work of washing the meat at times when the plant was not in operation—on Sunday or at night or early morning, whenever it was most convenient for him—and had been so doing from the time the arrangement for his presence at the plant was first made. Defendant Heuck, the plant superintendent, testified that he knew that after the meat was slaughtered the men came in to wash it at certain regular intervals, but did not know the exact interval. For the period that the Kosher slaughtering had been going on at the plant, however, he did know that men were coming into the plant for the purpose of washing the meat. The plant superintendent also testified that there were no restrictions placed upon plaintiff (or upon any Kosher slaughterer) as to when this work might be performed.

It is held in *Glaser v. Rothschild,* 221 Mo. 180, 1. c. 186, that "the invitation may be implied by a dedication, or it may arise from known customary use. So, too, it is held in all the cases that the invitation may be implied by any state of facts upon which it naturally and reasonably arises." Even if there were no specific invitation to plaintiff to use the premises where he was injured, it is our view that the facts herein recited amply infer or imply an invitation to use the premises where plaintiff was injured. The fact that defendant sought to avail themselves of the benefit and profit from the sale of Kosher meat, and that they knew of the necessary ritual that makes such meat available for the Kosher trade, and the fact that they knew and acquiesced in plaintiff's presence at the plant, not only for the purpose of killing and examining the animal, but also for the purpose of washing meat set aside for the Kosher trade, and that no restrictions were placed upon plaintiff as to the time when the washing of the meat should be done, and that the night watchman or doorkeeper at the plant was instructed to, and did, permit plaintiff to enter at times when the plant was not in operation and at such a time as plaintiff was present when he was injured, and that plaintiff's work in washing the meat was of mutual benefit to himself and to defendant company, all lead to the conclusion that the plaintiff was an invitee to that portion of the premises that he would reasonably be expected to use in performing the work of washing the meat, and we so hold.

We are mindful of the rule as laid down in *Ducoulombier v. Baldwin,* 101 S. W. (2d) 96, 1. c. 101, that "an invitation to premises is concurrent as to time and place and cannot be broadened so that it extends to all parts of the premises involved." In holding that the invitation in the case at bar extended to the part of the premises where the injury occurred is not, as we view the evidence, in anywise in conflict with this rule. In the instant case the evidence warrants the conclusion that the invitation to plaintiff was not limited to the premises at and immediately about the killing beds, but included also the premises over which he must traverse when performing his duties in connection with washing the meat.

We now refer to defendants' further contention that if plaintiff was other than a mere licensee, then he was an employee of the defendant company and any right to compensation for his alleged injuries is exclusively under the provisions of the Kansas Workmen's Compensation Act and under the agencies and tribunals of Kansas set up by such statutory enactment, and accordingly the Jackson County, Missouri, Circuit Court had no jurisdiction in this action.

At the outset of defendants' argument in support of this contention appears the following language: "While he (the plaintiff) testified that he received his compensation directly from the association and the treasurer thereof, he admitted that Cudahy Packing

Company paid his compensation to the association, sending checks in payment thereof to the treasurer and other designated parties.'' While the evidence shows that checks in unstated amounts were sent at various times to the Kosher Star Butchers Association, and at least on one occasion to Rabbi Braver, and at least on another occasion to the treasurer of said association, we find nowhere in the record any evidence to the effect that these checks covered the salary or wages received by plaintiff as a Kosher slaughterer. While defendants' counsel, in the trial of the case, called plaintiff's attention to certain checks said to be executed by the Cudahy Packing Company in favor of the above-named parties, and while counsel intimated that he would introduce them in evidence, the record does not disclose that any of them were ever introduced in evidence. The record does not disclose any relationship between certain checks therein referred to as having been issued by the defendant packing company and the salary or wages of $67 per week received by plaintiff as wages or salary. The only possible conclusion to be drawn from the testimony is that plaintiff was employed and paid by the Kosher Star Butchers Association for the services rendered in the ritualistic slaughtering of animals and the washing of the fore quarters of the meat not only at the defendant plant but also at other packing plants in Greater Kansas City. Contrary to defendants' contention, the evidence discloses that the plaintiff was never an employee of the defendant packing company. The defendant packing company exercised no direction or control over the work which he performed on the company premises and, furthermore, the plaintiff had the right to reject the meat from any animal that, from an examination of certain of its internal organs, did not meet Kosher requirements. The plaintiff was merely performing services for his employer, the Kosher Star Butchers Association, as an invitee at defendant company's plant. Notwithstanding the broad interpretation given to the terms of the Act by the Supreme Court of Kansas, we are of the opinion that, under the facts in this case, plaintiff's injuries are not compensable under the Kansas Workmen's Compensation Act. Section 44-508, subdivision (i), General Statutes of Kansas, 1935, defines a workman as follows:

'' (i) 'Workman' means any person who has entered into the employment of or works under contract of service or apprenticeship with an employer. Any reference to a workman who has been injured shall, where the workman is dead, include a reference to his dependents, as hereinafter defined, or to his legal representatives, or where he is a minor or incompetent, to his guardian.''

Section 44-503 of the Act contains the following provision:

'' (a) Where any person (in this section referred to as principal) undertakes to execute any work which is a part of his trade or business or which he has contracted to perform and contracts with any

other person (in this section referred to as the contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any workman employed in the execution of the work any compensation under this act which he would have been liable to pay if that workman had been immediately employed by him; and where compensation is claimed from or proceedings are taken against the principal, then in the application of this act references to the principal shall be substituted for references to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the workman under the employer by whom he is immediately employed.''

By the express terms of the Act, therefore, any employee of a subcontractor injured in the prosecution of work for the principal is entitled to compensation under the Act, and unless either he or the employer rejected the Act, this remedy under the terms of the Act is exclusive.

Defendants in their answer pleaded the Kansas Workmen's Compensation statute and various decisions of the Supreme Court of Kansas, which, under the particular facts in those cases, rule that the employee comes within the terms of the Act. We are, however, of the opinion that none of the cases presented and none of the cases cited in defendants' brief present facts sufficiently analogous to the facts in the instant case as to be controlling here.

An analysis of each of the cases cited by defendants would necessitate an opinion beyond all reasonable length. We shall, therefore, discuss in detail only a few which will illustrate distinctions from the facts in the case at bar, fairly typical of the rest.

In *Purkable v. Greenland Oil Co.*, 122 Kans. 720, an oil company, engaged in developing mineral resources of leased land and producing oil therefrom, entered into a contract with one F. J. Hedges to do the work of tearing down and rebuilding derricks on the leased premises. Hedges "furnished his own tools, employed his own workmen, and did the work according to his own plan and method, for a standard price, free from control reserved or exercised by the company." The company directed Hedges to take a derrick from a lease on which the company had been operating and to build a 74-foot derrick on the Shambaugh lease. This was a producing lease and the work of drilling well No. 4 thereon "to which erection of the derrick was an incident, was being conducted by the company." Hedges employed Harry V. Purkable as a workman. When the derrick was partially completed, Purkable fell from it and received injuries which resulted in his death.

In holding that the death of said employee of Hedges' resulting from a fall from the derrick then being operated on the company lease, was compensable under the Workmen's Compensation statute, the court said:

"The section provides that when any person, called principal, undertakes to execute any work 'which is a part of his trade or business,' *and contracts with another person, called contractor, for execution of the whole or any part of the work,* the principal shall be liable to pay to a workman employed in execution of the work any compensation for which the principal would have been liable if the workman had been employed directly by the principal."

When the italicized language in the preceding quotation is noted, distinction from the facts in the case at bar must be apparent. If, in the instant case, the evidence showed the packing company employed the Kosher Star Butchers Association to perform certain work which was a part of the company's business and that an employee of the association was injured while in the performance of such work, then, assuming no further facts, it might be fairly contended that an analogous situation was presented. But, as heretofore pointed out, the record shows no such situation; the record, as to any contract of employment between the packing company and the butchers association (plaintiff's employer) is silent. There is evidence that the defendant company, on different occasions, delivered checks to the butchers association, but the respective amounts of the checks, or the number thereof, or the purpose for which they were given, is left solely to conjecture. With respect to plaintiff's activities at defendant's plant, the record only shows that Mr. Feinberg of the Feinberg Kosher Sausage Company made an arrangement with the packing company, whereby the packing company would furnish the Feinberg Kosher Sausage Company with Kosher meats. The accomplishment of this end required the services of a duly qualified Kosher slaughterer to do the killing, the inspection of the animal, with the right of rejection, and periodical washing of the meat—all in conformity with the ritual of the Orthodox Jews. As a part of this arrangement, the packing company consented to plaintiff's coming upon the packing premises as a Kosher slaughterer and performing the above-described duties essential to the production of Kosher meat. The consideration moving to the company for making available its premises to the plaintiff for the doing of this work was the benefit to be derived from its sale of Kosher meat. From this it appears that the plaintiff was not an employee of the defendant company, and was not an employee of anyone else who, so far as the record discloses, had a contract with the defendant company for the performance of certain of the services essential to the conduct of its business. The fact that the plaintiff, in the instant case, had the right to reject any animal which failed, in his opinion, to meet the qualifications for Kosher meat, adds a further distinguishing fact from the facts in the *Purkable* case. Furtherfore, the work performed by plaintiff was not of the usual and ordinary character of work performed by slaughterers regularly employed by the defendant

company. Plaintiff's work was more nearly work of a professional nature, with a background of religious sanction.

In *McKinstry v. The Guy Coal Co.*, 116 Kans. 192, the defendant was operating a coal mine. Plaintiff was employed by the defendant to mine coal on the basis of 60 cents for each mine car of coal produced. He was to furnish his own tools, supply his own materials, such as powder, fuses, etc., necessary in the mining of coal. He was injured and filed a claim under the Workmen's Compensation Act. Defendant contended that the facts constituted the plaintiff an independent contractor and took him out of the operation of the Compensation Act. The court held that:

"For the purpose of this case, wages may be appropriately defined as that which one pays to another for labor performed. That labor may be by the hour, by the day, by the week, by the month, or *by the piece*," and that, therefore, the plaintiff was an employee of the defendant and was injured in the course of his employment, and that his injuries arose out of and in the course of his employment of mining coal. A mere statement of the facts shows that this case is not in point.

In the case of Leebolt v. Leeper, 128 Kans. 61, plaintiff was an employee of the Otis Elevator Company, which was engaged in installing elevators in the Jayhawk Hotel at Topeka, Kansas. A wheelbarrow of brick, which was being hoisted, tipped over and a brick therefrom struck plaintiff on the head and injured him. Using the language of the court, "the pertinent question for solution is whether the Otis Elevator Company was installing the elevators under a contract with the defendant Leeper, or whether the contract was between the Topeka Hotel Company and the Otis Elevator Company. If the contract was between Leeper and the Otis company, the latter a subcontractor, the plaintiff was entitled to compensation under the Workmen's Compensation Act, but not entitled to recover in an action for damages." The plaintiff had brought suit for damages, contending that he was not subject to the provisions of the Compensation Act. It was plaintiff's contention that his immediate employer was the Otis Elevator Company which was putting in the elevators as an independent contractor, its contract being with the Topeka Hotel Company, and that his injuries were caused by negligence of the employees of the defendant Leeper, who had the general contract for the construction of the hotel building, but not for the installation of the hotel elevators. Contrary to plaintiff's contention, the court found the facts to be that the defendant Leeper had a contract with the hotel company to build the entire building, including putting in the elevators, and that the contract for the installation of the elevators was between the Otis Elevator Company and the general contractor Leeper. From these facts, the court held:

"It necessarily follows that the plaintiff must be treated under

the Workmen's Compensation Act as an employee direct of Leeper and Williamson, the general contractors, so that recovery for his injuries will not lie in a suit for damages, but must be in the nature of a claim for compensation under the Workmen's Compensation Act.''

Upon these facts, the *Leebolt* case comes clearly within the express provisions of the subcontracting section of the Kansas Workmen's Compensation Act and is not in point here, in that the facts are not analogous to the facts in the instant case as hereinabove set out.

Pribennow v. Meeker, 139 Kans. 325, presents almost precisely the same situation as in the *Leebolt* case, *supra*. Here the trial court found that the Meeker Company was a subcontractor under the Claude Neon Federal Company as general contractor, and that the injured employee of the Meeker Company therefore came within the provisions of the Compensation Act.

The case of Mendel v. Fort Scott Hydraulic Cement Co., and American Service Co., 147 Kans. 719, 78 Pac. (2d) 868, which defendants in the case before us, contend is directly in point, presents a situation wherein one employer ''lends'' his employees to another employer. Briefly stated, the facts were as follows: The Cement company operated cement plants near Fort Scott, Kansas, and the Ice company (American Service Company) operated one or more ice plants in the city of Fort Scott. The Ice company, in reinstalling and repairing one of its plants, found it necessary to dig a drainage ditch. In the course of this work, the Ice company struck rock and found it impossible to continue excavation by means of pick and shovel. It thereupon obtained from the Cement company the necessary equipment and two men, including the claimant, to blast the rock. No foreman or supervisor from the Cement plant accompanied the men or the equipment. Under the arrangement, the Ice company was to pay $3 per day for the use of a drill and to pay the Cement company for the time of the men so used and for explosives and other materials furnished. It was the contention of the Ice company that the Cement company was an independent contractor and was solely liable for the compensation. The court found that the Cement company ''did not undertake to construct a drainage or sewer ditch for the Ice company. It loaned its men, rented its drill and sold certain materials to the Ice company in order that the Ice company might complete *its own undertaking*. . . . Insofar as actual supervision of the project was concerned it, and not the Cement company, was in charge. . . . It was upon that finding the trial court concluded the Ice company was the special employer of the claimant and as such was liable for compensation jointly with the Cement company, the general employer. The Cement company was not an independent contractor.'' The court further held (1. c. 726) that:

''In view of all the circumstances we are forced to the conclusion there existed a joint right of supervision, if not in fact a positive duty,

on the part of both the general and special employers to see that the workmen of both employers were protected from injury. Under such circumstances we are not inclined to follow the view of some courts, which seem to hold that in order for the special employer to be liable he must have exclusive supervision and control of each and every phase or incident of the work. Neither are we willing, under such circumstances, to relieve the general employer of liability.''

The Cement company and the Ice company were held jointly liable.

The defendants contend that (quoting from their brief), ''if plaintiff was the general servant of the Kosher Star Butchers Association, he became the special servant of defendant packing company, so as to put him within the Compensation Act. . . . The court rules on this particular point most emphatically (147 Kans. page 726), that it is not necessary that the 'special employer' have exclusive control of such loaned servant.'' Defendants' conclusion is based upon an assumption of facts in the instant case which the record does not support. In the first place, as we have heretofore pointed out, the packing company had no authority to, and did not attempt to, exercise any control over the plaintiff or over any of his activities while at the plant, and, further, the butchers association did not ''lend'' the plaintiff to the packing company in the sense that the Cement company loaned its employees to the Ice company in the *Mendel* case, *supra*. Again we point out that the packing company, so far as the record discloses, did not pay to the butchers association plaintiff's salary, or the proportion thereof that might be allocated to the work which he did at the defendant plant.

We have examined the other authorities cited by defendants in support of their contention that plaintiff's injuries are compensable (if compensable at all) exclusively under the Kansas Workmen's Compensation Act, and find that the factual situation in each is distinguishable from the factual situation in the case at bar. It is our conclusion, therefore, that the facts in this case do not bring plaintiff's claim within the provisions of the Kansas Workmen's Compensation Act.

Defendants make the further contention that the place where plaintiff was injured was under the exclusive control and use of officers of the United States Government, and that plaintiff cannot recover, because (a) the place of injury was a space outside of the area of plaintiff's alleged invitation to use the plant premises, and (b) plaintiff was injured in Government territory.

In our opinion, the facts in this case do not create the space enclosed within the six-inch curbing as a place of sanctuary wherein defendant packing company is absolutely relieved from all liability for any injury occurring there. This space was reserved for the use of the United States Government inspectors within which to make final inspection of the meat questioned as to fitness for human consumption.

However, the defendant was charged with maintaining this space in a clean and sanitary condition. The defendant Daniels, an employee of the company, was one of those directly charged by the defendant company with this duty. Defendant Heuck, who was the superintendent of the defendant plant, testified that it was the defendant Daniels' duty to clean up this space and to clean out the pipe or chute, and that it was his duty to replace the cover on the chute after he had cleaned it out. To this extent, therefore, this space was not under the complete and absolute control of the Federal Government or its agents, as defendants contend. But even if this were true, defendants have cited no authority, and we have discovered none, which holds that the portion of the premises of a packing company reserved for the use of Federal inspectors to examine the meat as to its fitness for human consumption, is Federal territory and that, as to such territory, the operators of the plant are relieved of any duty to maintain same in a reasonably safe condition for persons having business in the plant premises and within immediate proximity of such reserved premises. It is plaintiff's contention that the defendant owed him the duty as an invitee of keeping the premises in a reasonably safe condition, and that defendant company's employees, while acting within the scope of their employment, in cleaning up the plant after the day's business, were negligent in leaving the cover off of this chute, and thus leaving the premises unsafe for plaintiff to use same within the scope of his invitation.

We must, therefore, rule that the space wherein plaintiff was injured was not Federal territory in the sense that defendants are immune from liability for their negligence resulting in injury to a person within said space.

Nor is there any merit in defendants' contention that the place of injury was a space outside of the area of plaintiff's invitation to use the premises. We have heretofore found that the invitation to plaintiff to use the premises extended to that portion of the premises on the fifth floor over which he was traversing at the time of the accident. It is doubtless true that his invitation did not extend to the hereinabove described space enclosed by the concrete curbing set aside for the use of United States Government inspectors, but he was authorized to use the passageway immediately adjacent thereto, and it was while using this space, which was included within the limits of his invitation, that he fell or stepped over this curbing (which was unprotected by any railing or barrier) and into the chute which was within two or three inches of this curbing.

In passing upon defendants' point that plaintiff was guilty of contributory negligence as a matter of law, we should perhaps, even at the risk of repetition, make further reference to the facts necessarily involving a determination of this question. Defendants knew that plaintiff made frequent visits to the fifth floor of defendant

company's plant to wash the Kosher meat. There was no restriction upon the time at which he might go. He usually performed the work of washing the meat at night-time or early morning when the plant was not in operation, and had been so doing during the entire period of more than a year that he had been doing work at the plant. Even if there was no direct evidence of defendants' knowledge of this fact, this knowledge might reasonably be inferred from the fact that the plant superintendent placed no restrictions upon the time at which he might do this work, and that the man in charge of the plant at night always let him in for the purpose of performing this service. On the particular morning of the injury, the place was dimly lighted by an electric light at the south side of the room, in addition to which plaintiff stated that there was a little natural light from the outside. He could see the floor and the curbing where he was walking, "but not so good," but could not, or at least did not, see the open chute. He had gone over the same course that he pursued on this morning numerous times. From the door at which he entered the room from the stairway, the bucket rack was on a practically direct line to the east, a distance of about sixty feet. There was an elevator immediately east of the entrance door. In pursuing his customary route to the bucket rack, plaintiff had to pass between the corner of the elevator on his left and a concrete column on his right, a space about four feet wide. The column formed the northwest corner of the space referred to as the "retain room" at the northeast corner of which the chute was located. There was a railing around a portion of this space, but none along the north side thereof along which plaintiff walked towards the bucket rack. The six-inch curbing defining the north side of this space did not run straight, but diagonally to the northeast, with the result that the northeast corner of the enclosure extended out into plaintiff's path. It is upon these facts that defendants must rest their contention that plaintiff was, as a matter of law, guilty of contributory negligence in falling into the open chute.

Defendants have cited numerous cases in support of this contention but upon examination we find the facts in none of these cases to be applicable to the facts and circumstances in this case, and hence they are not controlling or decisive of the issue of contributory negligence as here presented. We dislike to extend this opinion unduly but feel we should discuss a few of the cases which defendants cite as being in support of their point on contributory negligence.

In the case of Weeks v. Atchison, T. & S. F. Ry. Co., 109 S. W. (2d) 375, decided by this court, it was held that the facts constituted contributory negligence as a matter of law. However, a recital of the facts in that case from the court's opinion will indicate a striking dissimiliarity from the facts in the case at bar. We quote from that portion of the court's opinion dealing with the question of contributory negligence:

"The evidence showed that deceased stood in a space between tracks 1 and 2, facing the north, watching one train pass east on track 3. As heretofore pointed out, the distance between the rails of the track behind him and the rail of the track in front of him was ten feet. There was ample room for one to safely stand between these tracks, even with trains passing on both at the same time. Knowing that he was in a place of danger; knowing that a train might at any minute appear on the track he was facing, and that the light in the yard was not as good as daylight; knowing that he stood on a curve where it would be difficult to see and where it would be difficult for the crew of an approaching train to see him; and knowing that the noise of the passing freight would make it difficult for him to hear another approaching train; knowing all these things as he is bound to have known them, his sense of sight and hearing being good, as his brother testified, he yet deliberately chose to await the passing of the freight train while standing 'at about the end of the ties' of the track in front of him. In such a position, eighteen inches from the tract itself, a man who had lived for two years within sight of one of the busiest railroad terminal yards in the Middle West was bound to know that he was liable to be struck by even a passing boxcar, and much more likely to be struck by an engine with its greater overhang. . . . A normal adult person is expected, and is required, to use due care for his own safety, and, failing to do so, cannot hold another for his injury under the doctrine of ordinary negligence. We are not concerned here with the humanitarian doctrine or with the "wilful and wanton' doctrine. . . .

"Plaintiff says deceased was looking out for danger because he constantly looked each way up and down the track. *His contributory negligence consisted in his having, before the danger arrived, chosen to take a stand at a place where he must inevitably be struck if a train passed on the track.* The point where plaintiff's evidence showed he stood was almost as dangerous as if he had stood on the track itself."

It would be difficult to conceive how reasonable minds could differ on the question of contributory negligence under the foregoing facts. There plaintiff's negligence was so flagrant that it would seem there could not be the slightest doubt that he was guilty of negligence as a matter of law.

Mullen v. Sensenbrenner Mercantile Co., 260 S. W. 982, was a suit for personal injuries occasioned by plaintiff falling on the tile entrance of defendant's mercantile establishment in St. Louis. The charge of negligence was that the tile entrance was an unusually slick, smooth and glassy surface and was on an "unusual, unsafe and dangerous angle or slope" and was maintained with a crack in it. In passing upon the question of plaintiff's negligence, the court said:

"Furthermore, while in the absence of notice or knowledge of an obstruction or defect in a street, a pedestrian may presume the way

is clear, yet, after notice of any such defect, he is guilty of contributory negligence, if he shortly afterwards fails to look out for such defect in his pathway, and is injured thereby. (Citing cases). . . . In this case plaintiff had fully observed the entrance and its condition when she entered defendant's store. She was injured about twenty minutes afterward in passing over said entrance in leaving said store. She testified that she had previously entered other stores with tile floors, and they were nothing new to her; that 'walking up an incline on a tile floor is all right, but not in coming down.' She saw when she entered that it was a tile floor, and that 'it was quite an incline,' and she then looked where she was walking, but in going out she testified she did not look at the floor or observe the incline, but looked straight ahead. She says she went out of the store because she was not promptly waited upon. Under the above authorities we are satisfied that, if there had been any negligent condition of the entrance, plaintiff's failure to look where she was walking when she went out and was injured was such contributory negligence on her part as a matter of law as to bar her recovery in this case.''

It should be noted, that unlike the facts in the case at bar, the facts in the *Mullen* case are that plaintiff entered the store in broad daylight and knew the condition of the entrance way, both as to the character of the surface and as to the slope, and as she came out twenty minutes later she did not ''look at the floor and observe the incline, but looked straight ahead.'' In the case at bar, the place where plaintiff was walking was dimly lighted; he was looking where he was walking, and he was unaware of and unable to see the pitfall within immediate proximity of the path he was traversing. This pitfall did not ordinarily exist, as the evidence shows that following the cleaning of the premises the covering for the chute was customarily replaced thereon.

McNeil v. Missouri Pacific R. Co., 182 S. W. 762, was a case involving injury from a passenger train in the State of Kansas. The plaintiff—The owner and driver of an omnibus which met passenger trains —was driving to the station with a load of passengers to meet an eastbound passenger train. He was late leaving the hotel and drove at a rapid rate, part of the time in a gallop. He did not see nor hear the train approaching until within a few feet of the track, at which time he saw the train and undertook to turn his horses. The horses were struck and the plaintiff was injured. In passing upon the question of plaintiff's contributory negligence, the court held:

''With knowledge that a passenger train from the west was due or about due, and that a train actually was coming from that quarter, plaintiff, in a wild effort to beat the train to the crossing, drove ''like Jehu'—right into the sphere of danger. If this were exercising care 'proportionate to the perils of the place,' it would be difficult to imagine a traveler's approach that could be denominated negligent, and

just as difficult to give a meaning to or find application for the rule that a railway crossing is a danger signal. That rule means that a traveler must use his senses, and not rely implicitly upon the servants of the company performing their duties, and, where by the exercise of ordinary care he is in position to see or hear, he must look and listen.''

The facts in this case do not present a sufficient analogy to the facts in the case at bar to constitute a controlling authority here.

In Curtis v. Capitol Stage Lines Co., 27 S. W. (2d) 747, defendants quote the following language as authority for supporting a contention that plaintiff in the case is negligent as a matter of law, to-wit:

''In view of this evidence, plaintiff cannot recover. It is apparent that her own negligence contributed directly to cause her injury. The prior negligence of defendant, if any, in creating the condition or situation in which plaintiff was placed did not relieve her of the duty to use ordinary care for her own safety in alighting from the car. There was nothing to prevent her observation of surrounding conditions, and if she had looked she could have seen the alleged hazard and danger, if any, then present. Knowledge which can be obtained by looking is imputed to one who fails to look, when there is a duty to look. Plaintiff had undertaken a long journey and was in possession of all of her faculties. She was obliged to use these faculties to discover her surroundings, if she did not know them, and to use ordinary care in her movements for her own safety. There was nothing to mislead or deceive her.''

But this language was directed to a set of facts entirely different from those in the case at bar. In the cited case, the driver of the automobile in which plaintiff was a passenger skidded to the right side of the road and into loose dirt or mud and stopped with its right wheels embedded in the dirt and the right running board nearly on the ground. All the passengers got out of the car. Plaintiff got out of the car, stepping backwards, and without looking in the direction she was moving, and as she stepped from the running board onto uneven ground, she fell and was injured. The court in its opinion points out that the other passengers, one of whom was a cripple and another with a babe in arms, stepped safely from the car to the ground, and that plaintiff did not even pretend to look in the direction in which she was stepping when, under the circumstances, she was unquestionably under a duty to look where, if she had looked, she could have seen. As said by the court:

''Plaintiff was fully aware of the situation; it was broad day; she knew it was not a regular stopping place; that the car was mired; that the driver could not pull forward or backward which he had tried to do.''

The distinction between these facts and the facts in the case at bar is too apparent to require further comment.

The case of Cox v. American Steam Laundry Co., 267 S. W. 77,

cited by plaintiff, presents a set of facts which we believe more closely analogous to the case at bar than other cases cited by defendants or plaintiff. The defendant operated a laundry plant which consisted of two buildings connected by a loading platform, built level with the first floors of said buildings. Plaintiff was doing some painting in the basement of one of the buildings and undertook to pass by way of a stairway to the loading platform and into the other building to procure some paint. There was a sewer fifteen inches wide and eighteen inches deep in close proximity to the bottom of the stairway. The sewer was ordinarily covered with a wood cover flush with the concrete floor of the basement. As plaintiff started on his mission he stepped into the sewer, the cover of which had been left off, and was thereby injured. Defendant contended that plaintiff was guilty of contributory negligence. With respect to this contention, the court said:

"The opening was even with the floor and filled to the brim with scalding hot water. By the undisputed facts in the case it was so located as to be peculiarly dangerous to defendant's employees, for *it was near a passageway* where defendant's employees were accustomed to pass and repass in the course of their work, and this was known to the defendant. It therefore became defendant's duty to take reasonable precautions to the end that no accident would happen. But no such precautions were taken. There was nothing there but the opening to indicate that the floor was not in its usual condition. No warning was given to the plaintiff of the opening in the floor. *There was no barrier or other protection around it.* To leave the hole filled with scalding hot water uncovered and unguarded, even for a short time, under the circumstances which the evidence tends to show, placed a pitfall in the way of an employee, who had occasion to pass over or near said hole in the performance of his duty and without knowledge of the opening, and was evidence of a failure of the defendant in performing his duty of furnishing his employees with a reasonably safe place in which to work. . . . We might add to what we have said that, under the circumstances disclosed by the evidence, it was a question for the jury whether the plaintiff, walking there to the stairway in the performance of his duty, was in the exercise of due care, even though he failed to notice the opening in the floor in a place where he had always found the floor in a safe condition, and where he had reason to believe it was safe."

The court thus held that, under these facts, plaintiff was not guilty of contributory negligence as a matter of law. Defendants suggest that this case is not an authority inasmuch as, under the law of Kansas, the question as to whether or not the facts constituted contributory negligence is a matter of law to be passed upon by the court. Defendants call attention to the fact that this court made that observation with reference to the Kansas rule in the case of Weeks v.

Atchison, T. & S. F. Ry. Co., *supra*. This court there cited, among other cases, in support of that statement, the case of Atchison, T. & S. F. Ry. Co. v. Withers, 69 Kans. 620. In the cited case the Kansas Supreme Court held that, under the facts disclosed by the record, plaintiff was guilty of contributory negligence, and hence could not recover, and in its opinion denying petition for rehearing, the court, at page 628 of the opinion, said:

"It is urged with much energy that the conclusion reached overrules the principle laid down in K. P. Rly. Co. v. Pointer, 14 Kan. 37, and many other cases announcing the same principle, to-wit:

" 'Where the facts, though undisputed, are such that when taken singly or in combination different minds will come to different conclusions as to the reasonableness and care of the parties' conduct, the question is one which may properly be left to the determination of the jury.'

"This doctrine is not overruled, but is recognized, affirmed, and applied. *This principle puts upon the court the ultimate duty of determining what cases, upon their facts, are to be left with the jury, and in what cases, upon their facts, the court must take the burden.* To declare a general principle is an easy matter; in its application lies the difficulty. The line that differentiates is a variant one. The debatable land is often a wide one. This was recognized by Mr. Justice Brewer, who wrote the opinion in the Pointer case, when he expressed 'great doubt' as to which side of the line that case ought to fall, and further said that the court ought not to permit the perpetration of a glaring wrong, even though sanctioned by the verdict of three juries. . . . So, of necessity, the court must in each case and upon its own facts determine whether it is one falling within or without the rule. In the case at bar the court by a majority of its members held the undisputed facts to be such as show contributory negligence on the part of the deceased of such gravity as to prevent recovery."

So that, under the Kansas rule, when the facts are such that different minds might reasonably come to different conclusions "as to the reasonableness and care of the parties' conduct, the question is one which may properly be left to the determination of the jury." This, apparently, is the rule which the court was applying in the *Cox* case, *supra,* when it held that under those particular facts the question of contributory negligence became one for the jury—hence we believe the rule announced in that case applicable here. The facts in the case at bar do not more strongly suggest negligence on the part of plaintiff than do the facts in the *Cox* case, *supra.* After a careful examination of all the cases herein referred to, and the rule of law applied by the courts to the various factual situations presented by these decisions, we are unable to reach the conclusion that plaintiff in the instant case was guilty of contributory negligence as a matter of law and we must, therefore, rule this point against defendants.

We think the evidence as to the negligence of defendants makes a case for the jury. The defendant packing company owed a duty to the plaintiff, as an invitee on the premises, to keep said premises in a reasonably safe condition for any use plaintiff might make of them within the scope of his invitation. It was the duty of the defendant company, and the other defendants named herein as its servants, to replace the cover upon the chute following the cleaning operations within the "retain room" space including the chute. The failure to do so, in view of the position of the chute with relation to the path to the bucket rack, would create a hazard from which injury to plaintiff might reasonably be anticipated. Had the entire space been completely protected by a railing, the situation might be different. The six-inch concrete curbing about this space would not of itself create a sufficient guard to permit reasonable assurance that a person passing along the adjacent passageway might not step into an open chute situated within two or three inches of this curbing. The trial court properly overruled defendants' demurrers to the evidence.

Finally, defendants contend that this case should be transferred to the Supreme Court of Missouri because it involves a Federal and constitutional question over which this court has no appellate jurisdiction. The grounds for this contention are: (a) that plaintiff's only remedy (if any remedy he has) is under the Kansas Workmen's Compensation Act, which remedy plaintiff can obtain only in Kansas tribunals and courts created by the Act to administer same, and (b) that the place where plaintiff was injured was under Federal dominion and authority and defendants are not liable for any injury occurring there. We have ruled both of these points, upon which this contention of defendants is based, against the defendants. Defendant Cudahy Packing Company filed a petition for removal to the Federal court, bottomed upon this point. The contention was there made, as it is here, that there was a separable controversy inasmuch as the defendant packing company, if liable at all, was liable under the Workmen's Compensation Act while the liability of the other defendants was in tort. The United States District Court ruled against this contention, as we have here, and remanded the case to the state court.

The judgment is affirmed. All concur.