No. 29,264.

MINNIE A. KENNEDY, *Appellee,* v. THE HULL & DILLON PACKING COMPANY, and UNITED STATES FIDELITY AND GUARANTY COMPANY, *Appellants.*

(285 Pac. 536.)

Opinion filed March 8, 1930.

*Al. F. Williams, Don H. Elleman,* both of Columbus, *A. B. Keller, George R. Malcolm, C. A. Burnett,* all of Pittsburg, and *Edgar Fenton,* of Kansas City, Mo., for the appellants.

*A. J. Curran,* of Pittsburg, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: This case involves a claim for compensation under the workmen's compensation law. Samuel G. Kennedy was an employee of the Hull & Dillon Packing Company, and had been for about twenty-five years, and on June 20, 1928, suffered an injury which resulted in his death. The plaintiff, his widow, made a claim for compensation, and she was allowed compensation in the amount of $4,000, and the sum of $150 for funeral expenses. The

Packing Company and the insurance carrier, the United States Fidelity and Guaranty Company, appealed from the award of the commission to the district court, where the findings and award of the commission were affirmed. The defendants appeal.

Samuel G. Kennedy was a traveling salesman and collector for the packing company located at Pittsburg, Crawford county, Kansas, and Kennedy was a resident of Pittsburg. His salary was $33 per week, and he was allowed not to exceed $22 per week for expenses. The packing company allotted him certain territory in which to solicit and collect. He was expected to call on the trade in the territory allotted to him, being the towns of Opolis, in Crawford county, Kansas; Columbus, Crestline, Galena and Lawton in Cherokee county, Kansas; Hockerville, Quapaw, Century, Picher, Carden and Commerce, in Ottawa county, Oklahoma; Waco, Asbury, Carl Junction and Smithfield, in Jasper county, Missouri. On the morning of June 20, 1928, he started on a trip from Pittsburg, expecting to make his first call at Crestline, in Cherokee county, and when he reached a point eight and one-half miles south of Pittsburg, he ran into an electric wire which had been thrown across the road in a storm, and was killed.

The contention of the defendant is that his death did not arise out of and in the course of his employment, in that he was on his way to assume the duties of his employment but had not reached the first stopping place on the trip. The first town that he was to make that day was Crestline, which was about sixteen miles from Pittsburg. It is insisted that Pittsburg, his home, from which he was traveling, although in the county of Crawford, was not one of the towns he was to make, and that he was not required to live at Pittsburg, where the plant is located. The orders that were taken by him were reported to the packing company by telephone, and no direct evidence was produced as to his going to the office of the plant when he turned in the money collected and made settlements with the defendant packing company. It was shown that the pay roll closed on each Saturday and the workmen were paid the following Tuesday. The evidence is that at all times when traveling in his district he was under the supervision of his employer. Since he was a traveling salesman in a designated territory, the traveling was a part of his duty, and he was at liberty to select his course in going from one store to another within that territory. The commissioner found that such a salesman is a necessary part of the trade or business of the packing company, and is as necessary a

part of selling meat products and collecting the price of them as an employee who works in the plant slaughtering animals. The defendants emphasize the fact that Kennedy was not required to live in Pittsburg, that he could have lived in any one of the towns where there were stores that he visited. He chose to live in Pittsburg, where no calls were to be made on the trade and therefore could not be regarded as being in the course of his employment. It is also contended that the injury and death were caused by an act of God, that the storm which blew down the poles carrying the high-powered electric wires produced his death, was a common hazard, had no causal connection with his employment and should be regarded as an act of God, something that no human foresight could anticipate or prevent. On the other hand, it is said that the violent storm which blew down the poles carrying the wires had ceased and his death was caused by wires of high voltage thrown to and left on the highway, and in no sense was caused by the violence of nature; that the deceased lost his life through a human agency, namely the electric wires and the poles carrying them.

It is claimed that the defendant was operating under the workmen's compensation law, and that Kennedy was one of its employees, who solicited orders for its products in an allotted territory and made collections from its customers. Being a traveling salesman, he was required to use the highways in calling on customers within the zone assigned to him. In that zone were the towns already mentioned in Crawford and Cherokee counties, Kansas, Ottawa county, Oklahoma, and Jasper county, Missouri, and he was traveling towards Crestline, in Cherokee county, when he was injured and killed. Was he within the allotted zone of his operations and in the course of his employment so as to make the injury a compensable one? If his duties as traveling salesman required him to travel over the highway where he was killed, with its well-known hazards, one of which he encountered, the action should be regarded to be in his working place and in the course of his employment. (*Tierney v. Telephone Co.*, 114 Kan. 706, 220 Pac. 190.) It is contended that he was not in the allotted territory until he reached Crestline, the first town he was to visit upon that day. It is claimed that he could choose his own place of residence, and that if he chose a residence out of his territory and was on his way to assume the duties of his employment at the time of the accident,

the accident cannot be regarded as arising out of and in the course of his employment, any more than could a mechanic who was injured while on his way to his shop, where he was employed to work, be regarded as entitled to compensation. The boundaries of Kennedy's allotted territory were not definitely fixed, nor were the highways over which he was to travel in the performance of his duty prescribed. For some reason, whether for his own convenience or that of his employer, or that of both, he made his home in Pittsburg, the place where defendant's plant was located. An assistant to the president of defendant packing company, and the manager, testified that he had allotted the territory to Kennedy and given him a route sheet, showing the towns to be visited, and that the usual time for him to start on trips was about seven-thirty in the morning, and to return to Pittsburg from his work from five to seven in the evening, depending upon the progress of his work during the day. The salesmen were required to report to the defendant packing company while at work, phoning in orders taken, and the manager said, "we want to know where they are at all times of the day," and that while traveling they are under the supervision of the company. He further stated that in the performance of his duties for the company Kennedy used the highway on which he was killed. He had seen Kennedy the Sunday before the accident, but couldn't remember seeing him on Tuesday, pay day, which was the day preceding the accident. It is argued that as he was not required to call on customers in Pittsburg, that place was not within his territory, but it appears that he was expected to go from that place in the morning and return to it in the evening. He could and did phone to the plant orders when taken, but he could not phone in the money collected from customers. It may be assumed that he went to headquarters and made settlements with the defendant of the money received and of his expense account, which was not to exceed $22 per week, and receive his salary, $33 per week. There is no direct testimony as to the transactions of the parties in Pittsburg, but in the nature of the business that would be the place where consultations would be had, instructions given, where the money collected would be paid in and settlement made for expenses incurred and salaries due. The manager spoke of the fact that he had not happened to see Kennedy the last pay day, as if it was the custom for him to come there for payment. In her testimony Ken-

nedy's daughter said that "he left Pittsburg on the morning of his death at seven-fifteen, and did not go to the plant that morning," as if he had gone on other occasions. Under the circumstances of the case, we think Kennedy should be regarded as within his territory and in the course of his employment when the accident occurred. His employment differs from one employed in the factory who might have been injured on his way to the factory where his work was to be performed. In such a case the worker would not be entitled to compensation. Kennedy's work required that he travel from place to place in the allotted territory in an automobile, calling on regular customers and in seeking to procure new ones. It was left to him to determine the roads he would travel over in doing his work. He was expected to keep in touch with the plant in Pittsburg and to promptly phone in orders obtained. While out canvassing the territory he was under the supervision of the defendant and subject to its orders. The place of work was not the boundaries of towns where orders were solicited or collections made. All contemplated that travel was necessary for the performance of his duties, and that it would take him through the counties named. If he had lived in Opolis and started from there to Crestline, he would certainly have been within his territory, and yet Opolis, where he was required to make a call, although not on a straight line, was between Pittsburg and Crestline, and Pittsburg is much nearer to Opolis than to Crestline. Instead of starting to Opolis on the fatal trip he intended to make his first stop at Crestline and had gone out of Crawford county, which was part of his territory and about one-half way to Crestline, when he was accidentally killed. When that occurred he was in the territory allotted to him, was under the supervision and control of the defendant and was carrying on the business in the usual way—the way in which it had been carried on for years.

We find no merit in the claim that the injury is not compensable on the theory that the death of Kennedy was caused by an act of God. There had been a storm the night before the accident, which had blown down poles and wires, but the storm had ceased and the poles and wires had not been removed from the highway. Kennedy was not killed during the storm or exclusively by the violence of nature. He came to his death by coming in contact with high-voltage wires, a human agency or rather an instrumentality of

human agency. (*Lewis v. Street Railway Co.*, 101 Kan. 673, 168 Pac. 856; Note in 13 A. L. R. 974.)

Although there is a contrary contention, it cannot be held that there was no causal connection between the employment of Kennedy and the injury. It is said that the hazard was one common to all persons using the highway. His work involved daily traveling over the highways in the performance of his duties and it became his place of work. His employment enjoined upon him traveling from place to place within his territory almost continuously in the discharge of his duties. He was using the highway in his employer's service when he was injured and was much more exposed to its hazards than people generally. We think that the service and injury were clearly an incident of his employment. (*Pegg v. Postal Telegraph-Cable Co.*, 129 Kan. 413, 283 Pac. 58, and cases cited; *Capital Paper Co. v. Conner*, 81 Ind. App. 545.)

Nor can we hold that Kennedy was engaged in interstate commerce or in commerce of any kind in his employment with defendant so as to be excluded from the benefits of the compensation act.

The judgment is affirmed.

JOCHEMS, J., dissenting.