## No. 35,879

BESSIE SCOTT and BARBARA CAROL SCOTT, a Minor by Her Guardian, Marie Bunner (Claimants), *Appellees,* v. KANSAS WESTERN PIPE LINE COMPANY (Respondent), *Appellee,* and TRAVELERS INDEMNITY COMPANY (Insurance Carrier), *Appellant.*

(146 P. 2d 366)

Opinion filed March 4, 1944.

*Homer V. Gooing* and *Wayne Coulson,* both of Wichita, argued the cause, and *C. H. Brooks, Howard T. Fleeson* and *Paul R. Kitch,* all of Wichita, were on the briefs for the appellant.

*Tom Smyth,* of Ness City, argued the cause, and *A. W. Wilson,* of Ness City, was on the briefs for the appellees.

The opinion of the court was delivered by

SMITH, J.: This is a claim for workmen's compensation. The commissioner of workmen's compensation made an award in favor of the claimant. On appeal the district court examined the record and gave judgment for compensation. The insurance carrier has appealed.

The accident which caused the death of claimant's husband occurred in Carbon county, Wyoming. The parties agreed that the claim might be heard in Ness county, Kansas; that the workman met his death by an accident; that proper notice was given; that claim

was made in due time and that the workman's average earnings at the time of his death were $200 a month.

When the application came on to be heard before the examiner for the commissioner of workmen's compensation the insurance carrier announced that it would not agree that the accident arose out of and in the course of the workman's employment with the Kansas Western Pipe Line Company, while that company admitted it had. The insurance carrier refused to admit that the relationship of employer and employee existed between the workman and the pipe-line company on the day of the accident; the pipe-line company contended that he was its full-time employee. The insurance carrier refused to admit that the parties were governed by the workmen's compensation act. The pipe-line company neither admitted nor denied that they were. The insurance company refused to admit that if the pipe-line company was liable it was the insurance carrier.

From the above statement it will readily appear that the question at issue was the relationship of the parties. The matters with reference to which there was no dispute will be noted.

The Kansas Western Pipe Line Company is a corporation organized and doing business under the laws of Kansas. It had been organized to buy and sell oil but at the time with which we are concerned it was engaged in operating two oil wells in Ness county, Kansas. One of these wells was owned by some parties in the East and the other by the Kansas Wyoming Oil Corporation, of which more will be said presently. The manner in which the Kansas Western Pipe Line Company was compensated for operating these wells was that it received the oil runs as they came due, charged the owners of each well a proportionate share of the cost of operating it and a small charge for overhead and paid what remained from the runs to the owners of the wells. This company maintained an office at Ness City, Kan.

The Kansas Wyoming Oil Corporation was organized under the laws of Colorado and had permission to do business in Wyoming. It owned a number of oil wells in Wyoming. These wells it operated for itself. H. L. Jewell was assistant secretary and treasurer of the Kansas Western Pipe Line Company. He was also assistant treasurer of the Kansas Wyoming Oil Corporation. R. T. Atkins was vice president of the Kansas Western Pipe Line Company. S. M. Newton owned a controlling interest and was a director

of the pipe-line company and was president of the Kansas Wyoming Oil Corporation. He also owned a controlling interest in the Newton Oil Company, a company which is only incidentally mentioned in this record.

The workman was an expert production man, handled the purchasing of equipment for oil wells and knew how to keep them in order for production. Previous to his going to work for the Kansas Western Pipe Line Company he was an employee of the Kansas Wyoming Oil Corporation. S. M. Newton, as has been noted, owned a large block of stock in both these companies. Atkins often carried out the orders of Newton in managing the affairs of these companies. It was necessary that in the late summer or fall someone should check the wells in Wyoming and prepare them for the winter production. The Kansas Western Pipe Line Company had an arrangement with the Kansas Wyoming Oil Corporation whereby the Kansas Western Pipe Line Company furnished the deceased to the Kansas Wyoming Oil Corporation for supervision in connection with the lease in Wyoming. He was directed by the Kansas Western Pipe Line Company to go to the oil and gas lease of the Kansas Wyoming Oil Corporation and inspect the wells there for the purpose of preparing them for winter production. In accordance with these instructions of the Kansas Western Pipe Line Company he went to the oil wells of the Kansas Wyoming Oil Corporation in Wyoming and there while inspecting these wells received the injury which resulted in his death. The trial court found that during all the time from March, 1941, until the time of his death Scott received his pay and expenses when away from home from the Kansas Western Pipe Line Company and received his directions for work from that company. He was at the time of his injury and death acting in accordance with his employment and directions from the Kansas Western Pipe Line Company and was not acting under the direction and employment of the Kansas Wyoming Oil Corporation. There was substantial evidence to sustain the finding that prior to March 1, 1941, he had been on the pay roll of the Kansas Wyoming Oil Corporation and was working as production superintendent in Wyoming. Sometime during December, 1940, he was in Ness county, Kansas, and did some work on the oil well in Ness county, which was owned by the Wyoming company and operated by the Kansas Western Pipe Line Company. There is no dispute as to the above facts. Claimant claims that the contract of employment was consummated between

Scott and the Kansas Western Pipe Line Company while he was in Kansas during December, 1940. Since the accidental death of the workman occurred in Wyoming, the claim is brought pursuant to the provisions of G. S. 1935, 44-506. That section provides as follows:

"This act shall not be construed to apply to business or employment which, according to law, are so engaged in interstate commerce as to be not subject to the legislative power of the state, nor to persons injured while they are so engaged: *And provided,* That this act shall apply also to injuries sustained outside the state where the contract of employment was made within the state, unless such contract otherwise specifically provides."

Attention is called to the proviso at the end of the above section.

At the hearing before the examiner, counsel for the insurance carrier raised the question in various ways but as a practical matter the issue submitted to the examiner was, first, whether the contract of employment between the workman and the Kansas Western Pipe Line Company was made in Kansas, and second, whether the policy issued that company by the insurance carrier covered the workman under the circumstances existing at the time he was killed.

The first question is one of fact. The examiner heard the evidence and in effect found that the contract of employment was made in Kansas. On appeal the district court made the same finding and gave a judgment for compensation. The award was against the Kansas Western Pipe Line Company and the insurance carrier. The appeal to this court is by the insurance carrier. The Kansas Western Pipe Line Company did not appeal. The time for appeal has gone by and the award is final as against the employer.

The scope of review in a workmen's compensation case is limited to questions of law. We cannot reëxamine the facts. If there is substantial evidence to uphold the award it must stand. See *Meredith v. Seymour Packing Co.,* 141 Kan. 244, 40 P. 2d 325, and *Miller v. K. S. Flint Rig Co.,* 155 Kan. 66, 122 P. 2d 734. The matters to be determined in such a proceeding may be established by circumstantial, as well as direct, evidence. (*Parker v. Farmers Union Mut. Ins. Co.,* 146 Kan. 832, 73 P. 2d 1032, also, *Carney v. Hellar,* 155 Kan. 674, 127 P. 2d 496.)

It has been noted that S. M. Newton was a large stockholder in both the Kansas Western Pipe Line Company and the Kansas Wyoming Oil Corporation. Jewell was the treasurer of one and the secretary of the other. He testified that the arrangement between these two companies as to Scott was made December, 1940. He

testified that Mr. Newton said, "We've got this man Scottie up in Wyoming that is a very good man," and he said:

"Why don't you hire him down in Kansas to look after the property down there and pay him sufficient salary that you could make him go up to Wyoming occasionally and check the property up there."

He also testified that the Kansas Western Pipe Line Company, the Kansas Wyoming Oil Corporation and the Newton Oil Company had offices in the same suite in Denver, and that the Kansas Western Pipe Line Company maintained an office in Ness City.

Both sides announced that they rested, whereupon the following colloquy occurred:

"Mr. Jewell: I haven't appeared for the Kansas Western Pipeline Company except as a witness. I don't know if there is anything I need to bring out further, but I did think that as long as Mrs. Scott was here that they get when and where he was employed for this work in Ness County and the fact they did live here on the lease and so forth. I think she could be a witness in that regard.

"Commissioner Wyman: I think you brought that out. And it was covered that they were living on the lease at the time of his death. This is all in the record.

"Mr. Jewell: I just wondered if it had been satisfactorily shown that he was hired here and worked here and drew his full compensation from the Kansas Western Pipeline Company.

"Commissioner Wyman: Yes, that was covered.

. . . . . . . . . . . . . .

"Commissioner Wyman: Where was he hired?

"Mr. Jewell: In Ness County, Kansas.

"Commissioner Wyman: Who hired him?

"Mr. Jewell: R. L. Atkins.

"Mr. Coulson: I move to strike out the testimony unless Mr. Jewell knows of his own knowledge.

"Commissioner Wyman: Were you there at the time he was hired, Mr. Jewell?

"Mr. Jewell: I was not there at the time he was hired, but I talked to Mr. Atkins over the long distance telephone. Mr. Atkins was in Ness City and the arrangement that was to be made was talked over and agreed on, and he proceeded to make this arrangement.

"Mr. Coulson: I object to all this as hearsay.

"Commissioner Wyman: I can ask Mrs. Scott then.

"Mr. Coulson: I want a ruling on my motion to strike his testimony about his being hired in Kansas.

"Commissioner Wyman: But he was on the pay roll."

Respondent argues that it was entitled to a ruling on its objection to the testimony of Jewell as to where the contract was made. As a matter of fact the commissioner did rule on it in effect when he

said, "I can ask Mrs. Scott then." The testimony was not hearsay and the objection should not have been sustained. Jewell was testifying to what he had learned from talking with another officer of the company, a man with whom he often talked as to the business of all the companies. The affairs of these two companies were so closely intermingled that it is next to impossible to tell with any degree of certainty where the activities of one stopped and those of the other began. Surely one officer of a corporation may testify as to what another officer has told him as to a transaction of the company in which they both took part. The trial court had the benefit of this transcript, much as it would have had the benefit of the transcript of a deposition.

Mrs. Scott testified that she was present in Mr. Atkins' room at the hotel in Ness City a while before Christmas in 1940. She testified as follows:

"Q. How long was that prior to the time you did come here? A. Well, it was a while before Christmas, because we were sitting in Mr. Atkins' room and he said to me, 'I don't suppose you would like it if I would send your husband back to work in Kansas, would you?'

"Q. Where was this conversation? A. In the Max Hotel, in Mr. Atkins' room.

"Q. Where is the Max Hotel? A. In Ness City, Kansas. He was kidding me because all my folks live in Kansas and I didn't particularly like it in Wyoming and he said he was going to send him to work in Ness City, and he told my husband, 'Of course I want you to go back to Wyoming from time to time to check up on the work there,' and he said, 'I don't feel like I can do that. The wages I'm getting now,' and he said 'We'll take care of that later.'

"Q. Who is Mr. Atkins? A. I don't know the official title he is supposed to carry. You better ask Mr. Jewell.

"Mr. Coulson: I will agree he is vice-president. Is that right?

"Mr. Jewell: Yes; vice-president of the Kansas Western Pipe Line Company.

"Q. Where did he live at the time that conversation took place? A. He was out of the Denver office. I don't think he has any particular address. Usually he looks after all their holdings. He lives at Denver part of the time and in California and in Wyoming. He was in Kansas at that time doing some work and he was staying at the Max Hotel and had been there for some time, but I don't know just how long, and I wouldn't try to say.

"Q. That conversation you had over there, was your husband then at that time hired to come out here in Kansas, do you know? A. Yes, sir.

"Mr. Coulson: I object to the answer as being a conclusion. She has testified to what was said.

"Q. What was said at the conversation about his being hired to come back here to Kansas? A. He said, 'I am going to hire you to look after this work

in Kansas.' He said, 'The lease has been falling off out here, and I think if I place you out here and they have a younger man, I'll see what you can do with it.' Also at the time he mentioned that Mr. Rueben Borger and Mr. George Sampson were also present in the room at the time that he told my husband that he was going to send him to Kansas.

"Q. Then you later did move here to Ness City, did you? A. That's right.

"Q. You moved out on this lease, did you? A. Yes, sir."

Recalled by the respondent, Mr. Jewell testified in part as follows:

"Q. You have had a number of conversations about the place where this man was employed with the Traveler's adjusters in Denver? A. That's right.

"Q. This telephone conversation you mentioned a while ago took place when between you and Atkins, without telling me what was said? A. My answer to that necessarily has to be like my answers to some of your other questions. You realize I had long distance telephone calls every day or two with Mr. Atkins, when he would call me and tell me we should do this or that, and we would agree on certain things, and this was one of the things that was said during that time.

"Q. About what period was it? Was it a month, two months, or three months before he came to Kansas? A. It was during December, and Mr. Newton and I had also talked in Denver about this arrangement.

"Q. Mrs. Scott has testified about working in California. That was for the Newton Oil Company; is that right? A. That's right.

"Q. Is there any connection between the Newton Oil Company and the Kansas Western Pipe Line Company and the Kansas-Wyoming Oil Company other than the fact that Mr. Newton owns a large block of the stock? A. No, there is no interholdings of the stock of the companies.

"Q. Did you have any conversation with Scott at the completion of the Wyoming Job, yourself, about his employment? A. Well, about the termination of his employment in Wyoming, or about the commencement of his employment in Kansas?

"Q. Either one. A. Yes, I was in touch with him. But Mr. Atkins really was the one that made the arrangements, and the arrangement was carried out, but I mean I was in on the carrying-out of the arrangement, but—

"Q. Your interest in the matter was knowing what the deal was? A. That's right."

It was the business of the trial court to examine this transcript, weigh the testimony, draw inferences and conclusions, indulge presumptions and make findings as to the facts. The trial court did that here. In a situation such as we have here where the same executive officers were speaking for the company by which the workman has been employed, as well as the company making the new contract, the employee will not be held to strict proof as to the making of the new contract, as to place where consummated, and by whom. The employee, of course, kept no books, the contract was

not in writing, there probably was no time when a representative said, "I hereby hire you to work for the Kansas Western Pipe Line Company" and to which the employee said, "I hereby accept the employment." He was in Kansas though. He did talk with a repre- sentative of the company about going to work for it. The insurance carrier argues that the trial court was bound to find that the contract of employment was made outside of Kansas because there is no evidence in this record that any officer of the company was in Kansas at the time the trial court found the contract was made. This is not quite a correct statement. There was evidence that one officer of the Kansas Western Pipe Line Company was in Kansas during December, 1940, and that he talked with Scott about going to work for that company. Ample circumstances and surroundings were established to sustain the findings of the trial court that the contract of employment was made in Kansas.

It will be remembered that the pipe-line company did not appeal from the judgment of the trial court. The judgment has become final as to it. This appeal is by the insurance carrier only. The next argument of the insurance carrier is that the policy issued by it did not cover this accident. In this connection it points out a provision of the policy, as follows:

"This agreement shall apply to such injuries (personal injuries to employees) so sustained by reason of the business operations described in said Declarations, which, for the purpose of this insurance, shall include all operations necessary, incident or appurtenant thereto, or connected therewith, whether, such operations are conducted at the work places defined and described in said Declarations or elsewhere in connection with or in relation to such work places."

Item 3 of the Declarations provides:

"Locations of all factories, shops, yards, buildings, premises or other work places of this employer by Town or City, with Street and Number.
"Ness County, Kansas and elsewhere in the State of Kansas."

Item 5 of the Declarations provides:

"This employer is conducting no other business operations at this or any other location not herein disclosed—except as herein stated: No exceptions."

It points out that the accident in which Scott was killed occurred in Wyoming, where he was doing work while he had been loaned to the Wyoming company. It argues that the work Scott was doing when he was killed was not necessary, incident, appurtenant to nor connected with the operations of the employer in connection with, or in relation to, the work places named in the policy. It argues that

on that account the policy did not cover the accident in which Scott was killed.

G. S. 1935, 44-559, provides as follows:

"Every policy of insurance against liability under this act shall be in accordance with the provisions of this act and shall be in a form approved by the commissioner of insurance. Such policy shall contain an agreement that the insurer accepts all of the provisions of this act, that the same may be enforced by any person entitled to any rights under this act as well as by the employer, that the insurer shall be a party to all agreements or proceedings under this act, and his appearance may be entered therein and jurisdiction over his person may be obtained as in this act provided, and such covenants shall be enforceable notwithstanding any default of the employer."

We have seen that the statute itself provides that it shall apply to injuries sustained outside the state where the contract of employment was made within the state. See G. S. 1935, 44-506. A construction of the policy such as that for which the insurance carrier contends would have the effect of eliminating that provision of the statute from the policy. This it could not do. The insurance features of the workmen's compensation act are for the benefit of the workman as much as for the protection of the employer. See *Gust v. Provident Life & Accident Ins. Co.*, 136 Kan. 88, 12 P. 2d 831. G. S. 1935, 44-559, was also for the benefit of the workman. The insurance carrier issued the policy, well knowing that the statute provided that it should cover accidents occurring outside the state. Furthermore, the policy contained a provision as follows:

"Does Hereby Agree with this Employer, named and described as such in the Declarations forming a part hereof, as respects personal injuries sustained by employees, including death at any time resulting therefrom as follows:

"To Indemnify this Employer against loss by reason of the liability imposed upon him by law for damages on account of such injuries to such of said employees as are legally employed wherever such injuries may be sustained within the territorial limits of the United States of America or the Dominion of Canada."

The company wrote this policy. It should be interpreted in favor of liability when there is an apparent conflict or ambiguity. See *Samson v. United States Fidelity and Guaranty Co.*, 131 Kan. 59, 63, 289 Pac. 427; *Sebal v. Columbian Nat. Life Ins. Co.*, 144 Kan. 266, 270, 58 P. 2d 1108; and *Rolfsmyer v. Kansas Life Ins. Co.*, 144 Kan. 520, 527, 61 P. 2d 865.

The fact that the accident in this case occurred outside the state is no more favorable to the position of the insurance carrier than if it had occurred at some place within the state other than the work

places described in the policy. (See *Kennedy v. Hull & Dillon Packing Co.*, 130 Kan. 191, 285 Pac. 536.) We see no distinction between this case and *Mendel v. Fort Scott Hydraulic Cement Co.*, 147 Kan. 719, 78 P. 2d 868. In that case two employers were held as well as the insurance carrier of each employer. The laborer was the regular employee of a cement company. This cement company loaned him at a profit to the ice company which required some blasting to be done. While doing this blasting for the ice company he was injured. The insurance carrier for the cement company made the same argument that is made here, that is, that its policy only covered two cement plants and quarries mentioned in the declaration. We held the language in the policy as to the work place was intended as a description rather than a limitation as to liability. This court said:

"In construing a policy, and especially where its terms are ambiguous, we are therefore warranted in giving to the policy such construction as will be in harmony with the intent and purpose of the act rather than a construction which will tend to defeat that purpose. Giving it that necessary construction, we conclude the employee was covered by the policy." (p. 731.)

See, also, *Bass v. Lebow*, 146 Kan. 487, 71 P. 2d 1071.

The trial court found that at the time of the accident to Scott he was acting in accordance with directions from the Kansas Western Pipe Line Company. The facts of the instant case bring it within the rule of liability laid down in the foregoing cases.

The judgment of the trial court is affirmed.

WEDELL, J. (dissenting in part): Assuming the insured employer, The Kansas Western Pipe Line Company, agreed in Kansas that Scott, its employee, might at certain intervals work for the Kansas-Wyoming Corporation in the state of Wyoming, I do not agree that fact made the insurer of his employer liable in the instant case.

The most liberal construction that possibly can be given the instant policy under any contention is that it covers the *business of the insured* wherever its business is located within the territorial limits of the United States of America or Canada. For present purposes I shall assume, without deciding, the policy is that broad. Scott was in no sense employed by the insured to work in Wyoming on any project which was even remotely connected with the business of his insured employer, The Kansas Western Pipe Line Company. It is conceded the insured had no interest whatsoever in the Wyoming corporation or in any lease the latter corporation was operat-

ing. Under the arrangement Scott was in reality permitted to be on a leave of absence for intervals from the insured, The Kansas Western Pipe Line Company, while he was working in Wyoming for the Wyoming corporation. Moreover, I do not find the slightest indication in the record that Scott while working for the Wyoming corporation and in the state of Wyoming was in any sense subject to the direction of the insured, the Kansas company, with respect to the methods or the performance of his labors for the Wyoming corporation. Under these circumstances the Wyoming corporation, of course, had the exclusive right and authority to direct, supervise and control his work for it in every particular. It could also discharge him at will. The decision in *Mendel v. Fort Scott Hydraulic Cement Co.*, 147 Kan. 719, 78 P. 2d 868, is not authority for holding the insured liable in the instant case. In that case it was a definite part of the business of the insured, the cement company, to do blasting work for itself. It was also a definite part of its business to hire out some of its employees, blasters, together with the company's equipment to do blasting work for others. The compensation the cement company received for such services of its men and the use of its equipment was in excess of the wages it regularly paid such employees. In other words, the cement company did this outside or additional blasting work at a profit to itself and as a part of its regular business. We have nothing like that situation here. In the instant case there is no doubt about the fact that this employee was doing the work of the Wyoming corporation and not the work of the Kansas corporation at the time of the accident. One of the tests applied in determining liability for compensation is, as clearly pointed out in the Mendel case, whose work was the employee doing at the time of the accident? In this case he was, of course, doing the work of the Wyoming corporation.

An employer may always confess his liability whether it exists or not, if he desires to do so, but, of course, he cannot thereby wish that liability onto his insurance carrier if the latter has no liability. In this case I think it is clear the insurer was not liable for an accident which occurred to Scott while he was employed in another state by an employer other than the insured.

THIELE, J. (dissenting): I cannot agree with the conclusion reached by the court in the foregoing opinion.

For convenience, I shall refer to the Kansas Pipe Line Company

as the "Kansas Company" and to the Kansas Wyoming Oil Corporation as the "Wyoming Corporation."

As is indicated in the opinion, in part, but as more clearly appears without dispute from the record submitted, one S. M. Newton, operating under the general title of Newton Development Company, owned a large amount of stock in both the Kansas Company and the Wyoming Corporation. He also operated the Newton Oil Company and had offices in Denver, Colo., for all of these concerns. Atkins, hereafter mentioned, was vice-president of the Kansas Company, but he worked for it and the Wyoming Corporation. Jewell was the assistant treasurer of the Kansas Company and treasurer of the Wyoming Corporation and worked for all of the Newton concerns. Neither Newton, Atkins nor Jewell lived in Kansas, but in Denver, Colo. At times here important S. M. Newton was president of the Wyoming Corporation and his son, F. D. Newton, was president of the Kansas Company but was not active and actually it was operated by the elder Newton who was on the board of directors.

In December, 1940, Newton sent Scott, the deceased workman, then employed in Wyoming by the Wyoming Corporation, to Ness county, Kansas, and it was in that month the claimed contract of employment was made between Atkins and Scott. It is here noted that Atkins did not testify and there was no evidence that Atkins was authorized on behalf of the Kansas Company to make any contract of employment with Scott or anyone else. Giving the fullest credit to the evidence as detailed by Jewell and Mrs. Scott as to what transpired at Ness City in December, 1940, it can hardly be said that a contract was made in Kansas at that time. Any conclusion there was a contract can only be reached by taking into account the fact that in March, 1941, Scott went to work for the Kansas Company in Ness county. But assuming that a contract was proved, the evidence shows that its terms were two-fold, that Scott was to do certain work for the Kansas Company in Kansas, and when so directed by Newton, Atkins or Jewell, was to work for the Wyoming Corporation in Wyoming. The evidence clearly disclosed that the Kansas Company operated only in Ness county, Kansas, and that it had no business or property in Wyoming and that it was not authorized to do business in that state. Scott worked for the Wyoming Corporation in Wyoming from December, 1940, until about March 1, 1941, when be began work for the Kansas Company in Kansas. Sometime in the summer he went back to Wyoming and

went to work for the Wyoming Corporation and he was there engaged on such work when he received the injuries which caused his death. This was not a case where an employee was loaned to or used by another than his employer. Scott was working in Wyoming as the employee of the Wyoming Corporation. While it is true that from time to time Scott received his pay checks from the Kansas Company, when he went to Wyoming to work for the Wyoming Corporation, the Wyoming Corporation reimbursed the Kansas Company for all salary and wages paid to Scott by the Kansas Company for the work done in Wyoming. The evidence discloses that the Kansas Company was not legally liable to Scott or his widow for compensation.

Jewell's testimony clearly discloses that he recommended attorneys to the widow in order that she might prosecute her claim against the Kansas Company and its insurance carrier. At the hearing the Kansas Company saw fit to admit that it was liable to Scott's widow, but that did not make the insurance carrier liable. Its liability depended on the legal liability of the respondent employer. (See *Taylor v. Taylor,* 156 Kan. 763, 137 P. 2d 147.)

As I read this record, the most that can be said for the Ness City conversations is that Scott was to have two employers, the Kansas Company for a part of the time and the Wyoming Corporation for a part of the time, and the evidence discloses that he was actually so employed. Insofar as the insurance is concerned the policy contained a set of declarations in which the Kansas Company stated that the location of all its work places was in Ness county, Kansas, and elsewhere in Kansas, and that it conducted no business operations at any other point. The evidence shows the declarations were true for the Kansas Company had no business and no property in Wyoming. There was nothing in the policy to cover operations of the Wyoming Corporation or its employees.

As has been stated the Kansas Company was willing that the Compensation Commission make an award against it and in favor of the widow, and it never appealed therefrom. We are not presently concerned with the rights of the widow for she will receive her award from the Kansas Company. We are concerned, however, with whether the evidence discloses a situation where the Kansas Company is attempting to pay for its liberality with the funds of the insurance carrier.

In my opinion the evidence discloses that no contract was made

in Kansas in December, 1940, or any other time that Scott was to work for the Kansas Company at any place other than Ness county, but on the contrary, the evidence shows that when he was to work in Wyoming it was for the Wyoming Corporation. Under such cir-,cumstances there was no basis for an award against the insurance carrier and it should be set aside.

HARVEY, J., concurs in the partially dissenting opinion of Mr. Justice Wedell, and in the dissenting opinion of Mr. Justice Thiele.