No. 33,776

Louis Mendel, *Appellee*, v. Fort Scott Hydraulic Cement Company and The Travelers Insurance Company, *Cross-appellants;* American Service Company and Casualty Reciprocal Exchange, *Appellants.*

(78 P. 2d 868) .

720

Opinion filed May 7, 1938.

*Hugh T. Fisher, Irwin Snattinger,* both of Topeka, and *Harry C. Blaker,* of Pleasanton, for the appellants.

*Douglas Hudson* and *Glenn H. Louderback,* both of Fort Scott, for cross-appellants.

*Harry Warren,* of Fort Scott, for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was an action under the workmen's compensation act for total permanent disability resulting from the loss of both eyes. The action was brought by Louis Mendel against the Fort Scott Hydraulic Cement Company, the American Service Company, and their respective insurance carriers, the Travelers Insurance Company and the Casualty Reciprocal Exchange. The first respondent will be referred to as the Cement Company, and the second respondent as the Ice Company. Judgment was rendered against both the Cement Company as a general employer, and against the Ice Company as a special employer, and against their respective insurance carriers. The Ice Company and its insurance carrier have appealed and the Cement Company and its insurance carrier have cross-appealed. As between the Cement Company and its insurance carrier, the latter occupies the position of appellee.

The Cement Company operated two cement plants and quarries near Fort Scott, and the Ice Company operated one or more ice plants in the city of Fort Scott. The Ice Company was remodeling and repairing one of its plants, and as a part of such work found it necessary or convenient to dig a new sewer or drainage ditch. While digging the ditch the Ice Company struck rock and found it impossible to continue excavation work by means of pick and shovel. Mr. O'Connor, the local manager of the Ice Company, obtained from the Cement Company the necessary equipment and two men, including the claimant, to blast the rock. The manager of the cement plant was not in the office and Mr. O'Connor made the arrangements for the men and equipment through Mary Monroe, a bookkeeper in charge of the Cement Company office. She in turn directed the foreman at the Cement Company's quarries to send

the equipment and two men to the ice plant. No foreman or supervisor from the cement plant accompanied the men or the equipment. Under the arrangement the Ice Company was to pay $3 per day for the use of an automatic drill, was to pay for the time the men were used and for the explosives and other materials furnished. Claimant had been employed by the Cement Company for approximately twelve years. He operated the jackhammer which was used in the drilling of holes for the reception of explosives. The other workman, Robert Galvin, was the powder man. Johnson, of the Cement Company, instructed the two workmen to report to the Ice Company. He gave them no other instructions. The men reported and were directed by Burg, engineer of the Ice Company, to the work to be performed. He advised them concerning the depth to which it would be necessary to excavate the ditch. He was present to oversee the work most of the time. After explosions the workmen of the Ice Company removed the dirt and rock. As the dirt was removed the high points could be observed. Burg then ran the level to ascertain how much additional rock it was necessary to remove. Mendel, the claimant, then removed the high points with the use of the jackhammer.

The testimony of Galvin, the powder man, was to the effect that from time to time, if there was something they desired to know, they consulted Burg. As to instructions by Burg, other than those previously mentioned, it appears they consulted him for directions as to the extent of the shooting with a view of keeping the Ice Company men at work. Burg admitted that Rogers, the erecting engineer, had authority to give instructions to the men, but he did not know whether he had given any. Burg was the foreman in charge of the work in the sewer ditch. He insisted the shots be muffled. This was done by means of placing large timbers over the shots. When the explosion did not force the timbers out of the ditch, the Ice Company employees removed, or helped remove, them. The men worked on a Friday and Saturday, and the injury occurred at about 9:30 o'clock Sunday morning, on December 20, 1936. It appears claimant drilled into a shot or unexploded portion of a shot, which resulted in his injury. Galvin, the shooter, had instructed Burg the night before that he thought one of the shots had not gone off entirely. Galvin marked the place on the bank of the ditch and Burg marked it on the building, so they would both know where it was. Just how it happened that claimant was permitted to

drill into the shot the next morning, does not appear. Since, however, this is not a negligence case, we need not pursue that question.

The Cement Company was notified of the injury and sent a man to take claimant's place. When the work at the Ice Company was completed, the workmen, with the exception of claimant, continued their regular employment with the Cement Company. The Cement Company had retained the men on their regular pay roll and it paid them their regular wages for the time they were working at the Ice Company. The evidence of the bookkeeper for the Cement Company was to the effect that she did not remember, without consulting her records, of other similar jobs, to which the workmen of the Cement Company had been loaned. She did recall various occasions on which the company had rented its machinery for similar purposes. The evidence of the workmen was to the effect they had been sent by the Cement Company to other similar jobs and had always received their pay directly from the Cement Company, except when they had worked on a WPA job. They were able to recall only one other job to which these same workmen had been sent together. Their regular wage was forty cents an hour. The Cement Company billed the Ice Company and received pay for the time the men worked, at the rate of fifty cents an hour. The Ice Company also paid the Cement Company the agreed rental for the drill and paid it for the material and explosives used. At the time O'Connor, the manager of the Ice Company, arranged for the Cement Company men to do the blasting work he inquired whether the Cement Company carried insurance on these men, and was advised it did. The Cement Company's insurance premium was based on its pay-roll audit. That audit, including these workmen, was, after the accident, submitted by the Cement Company to its insurance carrier. It refused to accept the premium based thereon.

The first question is, Who is liable for the compensation, the Cement Company, the Ice Company, or both? The second question is, If the Cement Company is liable either separately or jointly with the Ice Company, is the insurance carrier of the Cement Company liable under the terms of its policy?

We shall first consider the contention of the Ice Company, the principal appellant. It urges the Cement Company was an independent contractor and as such is solely liable for the compensation. In order to determine the actual relation of the parties under any employment, the courts will look to all the circumstances in-

volved in the particular case. (*Pottorff v. Mining Co.*, 86 Kan. 774, 780, 122 Pac. 120.) In the Pottorff case it was said:

"Various definitions have been essayed of the term 'independent contractor,' as used in the law of master and servant, the sense in which it must be applied here. Judge Lurton, in *Powell v. Construction Company*, 88 Tenn. 692, 13 S. W. 691, said: 'An independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to control of his employer, except as to result of his work.' (p. 697.) While any definition might not exactly fit all possible cases the foregoing has the merit of brevity and is approved in *Humpton v. Unterkircher & Sons*, 97 Iowa 509, 514, 66 N. W. 776, and other cases. An independent contractor represents the will of his employer only in the result of his work and not as to the means by which it is accomplished. (1 Thomp. Com. on the L. of Neg., § 622.)" (p. 781.)

In the recent case of *Bittle v. Shell Petroleum Corp.*, ante, pp. 227, 231, 75 P. 2d 829, this court reviewed numerous authorities dealing with liability, and said:

"What is an independent contractor?

" '(3) An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking.' (Restatement, Agency, § 2.)

"In comment to section 403, Restatement of Torts, it is said:

" 'a. The words "independent contractor" denote any person to whom the construction, rebuilding or repairing of a chattel is entrusted in such a way as to give him charge and control of the details of doing the work, irrespective of whether the work is done gratuitously or is to be paid for by his employer or is in any other way of financial or other benefit to the contractor.' (p. 1091.)

"This definition and comment accord with our own pronouncements. (*Pottorff v. Mining Co.*, 86 Kan. 774, 122 Pac. 120, syl. ¶ 2; *Maughlelle v. Mining Co.*, 99 Kan. 412, 161 Pac. 907; *Brownrigg v. Allvine Dairy Co.*, 137 Kan. 209, 19 P. 2d 474.)" (p. 231.)

The real test is the right or authority to interfere, direct, supervise or control, and not the actual interference or exercise of the control by an employer which determines whether one is a servant rather than an independent contractor. (*Murray's Case*, 130 Me. 181, 154 Atl. 352, 75 A. L. R. 720.) See, also, annotations in 19 A. L. R. 226; 75 A. L. R. 725 and 14 R. C. L., Independent Contractors, § 3; 71 C. J., Workmen's Compensation Acts, § 185.

The cement company, in the instant case, did not undertake to construct a drainage or sewer ditch for the Ice Company. It loaned its men, rented its drill and sold certain materials to the Ice Company in order that the Ice Company might complete its own undertaking. The Ice Company constructed its own sewer or drainage

ditch. Insofar as actual supervision of the project was concerned it, and not the Cement Company, was in charge. The trial court so found. It was upon that finding the trial court concluded the Ice Company was the special employer of the claimant, and as such was liable for compensation jointly with the Cement Company, the general employer. The Cement Company was not an independent contractor. Whether it is liable as a general employer we shall discuss presently.

The Ice Company next contends the finding of fact concerning the supervision and control over the loaned workmen is without support in the record. The facts previously narrated, insofar as actual general supervision of the work was concerned, support the finding. The question of the Cement Company's right to supervise any portion of the work will be treated later.

Does the loaning of a workman under circumstances narrated render the Ice Company a special employer, and is such special employer liable under the workmen's compensation act? In 71 C. J., Workmen's Compensation Acts, § 141, the rule is stated thus:

"The general test in determining whether a person to whom an employee is lent becomes his employer, and liable for compensation, is whether he assumes the direction and control of the employee. As otherwise stated, it is the right to control and direct the activities of the employee, or the power to control the details of the work to be performed and to determine how it shall be done and whether it shall stop or continue, that gives rise to the relationship of special employer and employee; or it must appear that, either by the terms of the contract or during the course of its performance, the employee of the alleged independent contractor came under the direction and control of the other party to the contract, and suffered injury as a consequence of such direction and control. It is not so much the actual exercise of control which is regarded as the right to exercise it. Where the employee comes under the direction and control of the person to whom his services have been furnished, the latter becomes his special or temporary employer, and liable for compensation; where he does not, the latter does not become his special or temporary employer, and is not liable for compensation, and the original employer remains liable for compensation. Complete, full, or exclusive control, supervision or direction has been required, and not mere suggestion as to detail; and it has been held that the mere fact that the work in which the servant is engaged is superintended by the agent of some one other than the master does not relieve the master of responsibility.

"For liability to attach to a person as a special employer, the employee must have been subject to his direction and control at the time of the injury." (p. 405.)

Our workmen's compensation act does not differentiate between special and general employers. (G. S. 1935, 44-508 h.) We think

it may properly include both. That there is a difference of views on the question of whether a special employer, in the absence of express statutory provision, is liable for compensation as well as the general employer, cannot be doubted. (See annotations, 3 A. L. R. 1181, 34 A. L. R. 768, and 58 A. L. R. 1467.)

It has, however, been definitely held, by what we regard as sound authority, that under circumstances similar to those in the instant case, the workmen may look to either or both employers for compensation in the absence of an express statutory provision to the contrary. (*Matter of DeNoyer v. Cavanaugh*, 221 N. Y. 273, 116 N. E. 992; *Employers' L. A. Corp. v. Indus. Acc. Com.*, 179 Cal. 432, 177 Pac. 273; *Matter of Schweitzer v. Thompson & Norris Co.*, 229 N. Y. 97, 127 N. E. 904; *Jaabeck v. Theodore A. Crane's Sons Co.*, 206 App. Div. 574, 201 N. Y. Supp. 743, reversed on other grounds in 238 N. Y. 314, 144 N. E. 625; *Pruitt v. Industrial Acc. Com.*, 189 Cal. 459, 209 Pac. 31; *Famous, P., Etc., Corp. v. Ind. Acc. Com.*, 194 Cal. 134, 228 Pac. 5; *Wright v. Cane Run Petroleum Co.*, 262 Ky. 251.)

In the Wright case it was held:

"General employer who directs employee to work under control of special employer is nevertheless liable to pay compensation for employee's injuries, and employee injured while working for special employer may look to either general or special employer for compensation." (Syl. ¶ 2.)

In *Famous, P., Etc., Corp. v. Ind. Acc. Com.*, supra, it was held that the pilot of an aeroplane, who is rented with the plane for a day by its owner to a motion-picture producer, from whom he takes all orders as to flight for the making of a picture, is, in case of injury, entitled to look to both employers for compensation.

The Cement Company insists that claimant, at the time of the injury, was an employee of the Ice Company. It reminds us the trial court found: He met with injury by accident arising out of and in the course of his work and employment at the Ice Company; that all control over him was at that time exercised by that company, and hence the Cement Company is not liable. Before discussing the conclusion contended for by the Cement Company, it will be necessary to also consider other findings. All findings must be read together with a view of harmonizing them with each other, and with the judgment, where that is possible. (*Jordan v. Austin Securities Co.*, 142 Kan. 631, 51 P. 2d 38.) In this case we think the findings can be so harmonized. The trial court also found claimant had been

for about twelve years, and was, on the date of the accident, an employee of the Cement Company. The correctness of that finding is not disputed. The trial court also found claimant was merely loaned to the Ice Company for the purpose of doing certain work. That the Cement Company directed him to do that work is not disputed. The trial court also found he was at that time receiving an average weekly wage of $19.20. That such wage was being received from the Cement Company is conceded. Neither is it disputed that the Cement Company charged and received from the Ice Company ten cents more per hour for the services of the workmen than it paid the workmen for their services at the Cement Company. While the Ice Company did supervise the work generally, there is no reason to doubt that the Cement Company retained a right to supervise the technical or dangerous aspects of the explosive work in which their men were engaged for hire. The trial court did not find the Cement Company surrendered such a right. Had it done so the finding would have been without support in the record. We cannot, and certainly will not, in the face of this record, say the Cement Company or the Ice Company had no right to see that claimant did not drill into a live shot of explosive. Moreover, both the shooter for the Cement Company, and Burg, the foreman of the Ice Company, recognized not only that right but apparently the duty to mark the location of the unexploded shot in order to protect the workmen of both employers. In view of all the circumstances we are forced to the conclusion there existed a joint right of supervision, if not in fact a positive duty, on the part of both the general and special employers to see that the workmen of both employers were protected from injury. Under such circumstances we are not inclined to follow the view of some courts which seem to hold that in order for the special employer to be liable he must have exclusive supervision and control of each and every phase or incident of the work. Neither are we willing, under such circumstances, to relieve the general employer of liability.

In addition to what has been said concerning the right of the Cement Company to exercise some supervision over the work of the men, it is well to bear in mind a few other pertinent facts. The Cement Company clearly retained the right to discharge its workmen for a refusal to do the work for the Ice Company which they were directed to do. It retained the right to replace these particular men with any other workmen in its employ. It did so when claimant

was injured. It, and not the special employer, had always, as in the instant case, paid the compensation of its workmen when similarly employed on other special work. In the case of *Matter of De Noyer v. Cavanaugh, supra,* it was said:

"Even where no property of the general employer is entrusted to the employee to be used in the special employment, the general employer pays the compensation, may direct the employee when to go to work and may discharge him for refusal to do the work of the special employer. The industrial commission, therefore, has full power to make an award against the general employer." (p. 275.)

The foregoing principle as stated in the Cavanaugh case has been quoted with approval in many, if not all, of the cases previously cited in which it was held the workmen might look to either or both employers for compensation.

The case of *King v. Railway Co.,* 108 Kan. 373, 195 Pac. 622, while not cited herein as controlling on the question of joint liability of a general and special employer, is enlightening as to the liability of the general employer to a workman whom he merely loans to another, but where the workman remains in the regular employ of the general employer. The question of joint liability was not an issue in that case.

The contentions of the Cement Company thus far stated are joint contentions of that company and its insurance carrier. In support of their contention that only the Ice Company, as a special employer, and its insurance carrier are liable, they cite *Baker v. Petroleum Co.,* 111 Kan. 555, 207 Pac. 789; *Carter v. Woods Bros. Construction Co.,* 120 Kan. 481, 244 Pac. 1; *Chisholm's Case,* 238 Mass. 412, 131 N. E. 164; *Jones v. George F. Getty Oil Co.,* 92 F. (2d) 255; *Sgattone v. Mulholland & Gotwals,* 290 Pa. St. 341, 138 Atl. 855, 58 °A. L. R. 1463; Restatement, Agency, § 227, *Illustration* 1. In none of those cases was the question of joint liability of the general and special employer involved. The real issue in the Carter case was whether particular services of a workman and recognition of him by the foreman as a workman, brought him within the compensation act as a workman. Attention is directed to our statutory definition of a workman which was there quoted:

" 'Section 44-508 of the Revised Statutes reads, in part, as follows: "Workman" means any person who has entered into the employment of or works under contract of service or apprenticeship with an employer, but does not include a person who is employed otherwise than for the purpose of the employer's trade or business.' " (p. 483.)

In the instant case claimant, while injured, was employed solely by the Cement Company and engaged in the furtherance of its own trade or business. There was evidence the Cement Company did blasting work not only in its own quarries, but rented its equipment and directed its men to do blasting work for others. The men always received their regular pay directly from the Cement Company except when working on WPA projects. Irrespective, however, of other similar work to which the Cement Company detailed its men, and notwithstanding the fact the construction of the sewer was in general supervised by the Ice Company, it remains an indisputable fact the injured workman continued to be an employee of the Cement Company and was in this place of danger and engaged in this hazardous employment solely by reason of obedience to the command of his general master, the Cement Company, and at a profit to that master besides. In this sense he was clearly engaged in the trade or business of his general employer. Moreover, he was engaged in the same kind of dangerous work as that performed in the Cement Company's quarries in which injuries are compensable under the act.

The Baker case was a negligence case, and the main question was whether the driver of a truck was the servant of the defendant or of an independent contractor. True, it was there said:

"It is well settled that the servant of A *may* for a particular purpose, or on a particular occasion, be the servant of B, though he continues to be the general servant of A and is paid by him for his work. 1 Labatt's Master and Servant, 2d ed., §§ 52-57, cites the language of Mr. Chief Justice Cockburn in *Rourke v. White Moss Colliery Co.,* L. R. 2 C. P. Div. 205:

"'When one person lends his servant to another for a particular employment, the servant, for anything done in that particular employment, must be dealt with as the servant of the man to whom he is lent, although he remains the general servant of the person who lent him.' (p. 209)." (p. 560.) (Italics inserted.)

The foregoing statement, together with the subsequent portion of the opinion, however, clearly indicates that a workman *may* be lent under such circumstances as to make the borrower liable for the acts of the workman. The case is not authority for a contention that every borrower becomes solely liable for the acts of the lent workman as a matter of law, irrespective of the circumstances surrounding the lending. In the recent case of *Hartford Accident & Indemnity Co. v. Addison,* 93 F. (2d) 627, it was held:

"The mere fact that a servant is sent to do work pointed out to him by a

person who has made a bargain with his master does not make him that person's servant." (Headnote, ¶ 5.)

The fact the authorities are in conflict as to the test for determining which employer is liable is further illustrated in the recent case of *Jones v. George F. Getty Oil Co.*, supra (1937), in which the controlling factor was held not to be a question of who had control over the employee, but the question of whose work was being performed. In the instant case, as previously indicated, the work was not only that of the Ice Company, but also the work of the Cement Company.

The insurance carrier for the Cement Company contends that even if it be held the Cement Company is liable, the insurer is not liable for the reason its policy covered only the two cement plants and quarries mentioned in the declarations and operations incident thereto. The same contention was made in *Bass v. Lebow*, 146 Kan. 487, 71 P. 2d 1071, in which the policy also contained other provisions identical with those in the instant policy. Such other provisions did not restrict coverage for injuries sustained at the specific locations mentioned in the policy. Those provisions are set out at length in the opinion in the Bass case, and need not be repeated here. It was there held:

"In an action for workmen's compensation the insurance policy provided that the work places of the employer were two oil leases described in the policy. The deceased workman lived on one of these leases, was carried on that pay roll and was killed while operating a rod-pulling machine on a lease other than one described in the policy. *Held,* that the work of operating the rod-pulling machine was incidental to the work of operating the oil leases and the death of the workman was covered by the policy." (Syl.)

After reviewing the various provisions, it was said:

"These provisions in the policy must be considered, as well as the provisions describing the location of the work places of the employer. When so considered it becomes apparent that the policy does not limit the liability of the insurer to what shall actually occur on those leases. The policy contemplated that the insurer would be liable for injuries to the employees of the insured while engaged in the operations of the employer as long as the work being done was necessary, incident or appurtenant to the operations of the employer, even though the actual injury should not take place on the property named. To this effect is the holding of this court in *Iott v. Continental Casualty Co.*, 129 Kan. 650, 284 Pac. 823; also, *Robertson v. Labette County Comm'rs*, 122 Kan. 486, 252 Pac. 196." (p. 491.)

It was then said:

"There remains the question, then, as to whether the work Bass was doing when he was killed, that is, the operation of a rod-pulling machine, was neces-

sary, incident or appurtenant to the operations of Lebow upon the lease in question." (p. 491.)

The question was answered in the affirmative. It is answered likewise here.

The insurance carrier also contends the designation of the locations of the two cement plants and the quarries was inserted in item No. 3 of the policy with typewriter, and since the typewritten portion was definite and certain, its provisions must govern over the printed provisions. For clarity we are placing the typewritten portion in parentheses. The pertinent portion of item No. 3 reads:

"Locations of all factories, shops, yards, buildings, premises or other workplaces of this employer, by town or city, with street and number. (One quarry and cement plant located 3½ miles north of Fort Scott, Kansas, and one quarry and cement plant located 1 mile north of Fort Scott, Kansas.)

"All business operations, including the operative management and superintendence thereof, conducted at or from the locations and premises defined above as declared in each instance by a disclosure of estimated remuneration of employees under such of the following divisions as are undertaken by this employer. 1. All industrial operations upon the premises. 2. All office forces. 3. Operations not on the premises."

Construing the above portion of item No. 3 in its entirety, is it clear and certain that the portion in parentheses was intended as a restriction or limitation of liability, or was it intended as a description of the location of the plants and quarries? Clearly that question is not free from difficulty.

The same contention is made concerning item No. 5, which reads:

"This employer is conducting no other business operations at this or any other location not *herein disclosed—except as herein stated:* (Other operations not covered hereunder.)" (Italics and parentheses inserted.)

Obviously, the first word "herein," contained in item No. 5, referred to all locations mentioned in the policy. Various provisions of the policy expressly extended coverage to other places than the cement plants and quarries. Were the words in item No. 5, to wit: "except as herein stated," intended to refer to what might have been inserted in the blank space of that item? If so, to what did the words inserted with typewriter in item No. 5, to wit: "other operations not covered *hereunder"* refer? No specific operations were designated in item No. 5. It is well to note that none of the provisions inconsistent with the theory of the insurance carrier was stricken out. In view of these circumstances the terms of the policy were not clear and unambiguous. Under such circumstances the

question of coverage must be resolved in favor of the insured. (71 C. J., Workmen's Compensation Acts, § 646 [4]; *Samson v. United States Fidelity and Guaranty Co.,* 131 Kan. 59, 63, 289 Pac. 427; *Sebal v. Columbian Nat. Life Ins. Co.,* 144 Kan. 266, 270, 58 P. 2d 1108; *Rolfsmyer v. Kansas Life Ins. Co.,* 144 Kan. 520, 527, 61 P. 2d 865.) Moreover, not only the rights of the employer and insurer, but the rights of the workmen, are here involved. In construing the effect of this policy, certain fundamental principles must be borne in mind. The purpose of the insurance requirement under the compensation act is to make certain the workmen will be protected. Every policy of insurance is required to be written in conformity with the provisions of the act, and the policy must contain an agreement that the insurer accepts all the provisions of the act. (G. S. 1935, 44-559.) This policy contained that provision. The act makes provision for compensation to the workman in the hazardous work in which he was employed by the Cement Company. (G. S. 1935, 44-505; 44-508 *d.*) In construing a policy, and especially where its terms are ambiguous, we are therefore warranted in giving to the policy such construction as will be in harmony with the intent and purpose of the act rather than a construction which will tend to defeat that purpose. Giving it that necessary construction, we conclude the employee was covered by the policy. In view of the foregoing it is not necessary to determine whether an insurance company may restrict its liability to a workman by making a contract with his employer which is less favorable to the workman than the act itself. That question can be settled when a case is presented which requires its determination.

It may be noted, also, that the premium rate in the instant case was based on the pay-roll audit. The policy of the Cement Company disclosed that the estimated total annual remuneration for quarrying work amounted to $40,000, with an estimated premium of $3,348, while the annual remuneration for cement manufacturing amounted to only $21,000 with an estimated premium of $1,757.70. This fact clearly indicates the extent of the Cement Company's quarrying work. It may be well, also, to recall that the men sent to the Ice Company for quarrying work were selected from the regular employees of the Cement Company, who were already covered by the policy in question, and that they were not additional men to those on whom the premium rate was based.

The insurance carrier contends claimant was not engaged in

quarrying work as that term is defined by G. S. 1935, 44-508 *d*, but was engaged in engineering work as defined by G. S. 1935, 44-508 *g*. The question under somewhat different circumstances might not be free from difficulty. That the Cement Company was not generally in charge of the engineering work of the Ice Company is clear. That blasting work may under circumstances properly become a part of engineering work may also be conceded. On the other hand, it is equally clear that the sewer ditch constituted a place, not a mine, where stone was being extracted, and that, in the instant case, it was being extracted by workmen of the Cement Company, at the direction of that company and as a part of its trade or business. These facts properly bring the work which claimant was performing under the definition of quarrying. It must always be remembered that the provisions of the compensation act must be construed liberally with a view of protecting the workmen, where that is reasonably possible, and not strictly with the view of defeating such protection. (*State, ex rel, v. City of Lawrence,* 101 Kan. 225, 165 Pac. 869; *Palmer v. Fincke,* 122 Kan. 825, 253 Pac. 583; *Rush v. Empire Oil & Refining Co.,* 140 Kan. 198, 200, 34 P. 2d 542.)

In the light of all the circumstances, in the instant case, we think the intent and purpose of the compensation act will be best upheld by concluding that both the general and special employers and their respective insurance carriers are liable to claimant for compensation.

The judgment is therefore affirmed.