William Patrick CORLEY, Plaintiff,

v.

HARDAWAY COMPANY, Intervenor/Plaintiff,

v.

WICHITA ELECTRIC COMPANY, INC., Defendant.

Civ.A. No. 94–1063–MLB.

United States District Court, D. Kansas.

Oct. 18, 1995.

Bradley A. Pistotnik, Brian D. Pistotnik, Affiliated Attorneys of Pistotnik Law Offices,

P.A., Wichita, KS, for William Patrick Corley.

Richard L. Honeyman, Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, KS, for Wichita Electric Company, Inc.

Douglas C. Hobbs, Kristin J. Blomquist, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Wichita, KS, for The Hardaway Company.

## MEMORANDUM AND ORDER

BELOT, District Judge.

This case comes before the court on defendant Wichita Electric Company's motion for summary judgment (Doc. 39). All parties have responded and the court is prepared to rule.

### Introductory Facts

Intervenor/Plaintiff Hardaway Company ("Hardaway") was under contract to construct taxiways for Wichita Mid–Continent Airport. Hardaway used a mobile concrete batch plant at the airport for its supply of concrete, which included a mobile trailer called a "control trailer." The control trailer contained an electrical panel that operated electrical functions and power to the mobile plant.

Hardaway subcontracted with Wichita Electric Company ("Wichita Electric") to connect power to the control trailer, which Wichita Electric did. On August 15, 1992, plaintiff Corley, Hardaway's plant foreman, noticed that the wiring on the control panel was malfunctioning and not powering the mixer. The mixer contained a batch of concrete which if allowed to set, would have

required Hardaway to be "out there a week jackhammering it out or shooting it with dynamite" (Doc. 40, Davis Dep. at 31). Hardaway employees immediately called Wichita Electric, and Gary Gehrer, the president of Wichita Electric, came to repair the panel. During the repair work, Gehrer was assisted by Corley and other employees of Hardaway. The nature and extent of the assistance is important and will be discussed separately, *infra.*

After Gehrer had completed working on the panel, Corley asked him if he could turn on the breaker. Gehrer's response is disputed, but the dispute is not material to the issue for decision.[1] Gehrer testified that he answered, "Just a minute, let's get this stuff out of here" (Doc. 43, Gehrer Dep. at 91); Corley testified that Gehrer answered, "Yeah" (Doc. 43, Corley Dep. at 81–82). At any rate, Corley pulled the main power switch to the control panel after asking Gehrer if it was alright and was injured when an electrical explosion burned him.

Corley received workers compensation benefits from Hardaway, then filed suit against Wichita Electric, alleging that Gehrer was negligent in repairing the control panel. Hardaway intervened to protect its subrogation rights against Wichita Electric pursuant to Kan.Stat.Ann. § 44–504(b).[2] Jurisdiction is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332.

### Facts Pertaining to Corley's Status [3]

Brad Craig, a project manager for Hardaway and the person of highest responsibility at the job site, testified: `

---

1. *Rosile v. Aetna Life Ins. Co.,* 777 F.Supp. 862, 868 (D.Kan.1991), *aff'd,* 972 F.2d 357 (10th Cir. 1992).

2. Hardaway has argued in its response and reply to Wichita Electric's summary judgment motion that it is entitled to equitable subrogation against Wichita Electric if the court finds Wichita Electric to be Corley's special employer. Hardaway did not move for summary judgment on the issue nor did Wichita Electric respond to Hardaway's argument in its summary judgment memoranda. The court accordingly will not rule on the legal obligations between Hardaway and Wichita Electric in this order.

3. The testimony excerpted in this section represents virtually all of the testimony presented by Corley and Wichita Electric on the issue of Corley's status as a general or special employee. It is set out in full so that there can be no misunderstanding about the evidence considered by the court. Plaintiff contends that Gehrer testified, at page 72 of his deposition, that "Pat had been working on the panel before I got there, he continued working on the panel while I was working on the panel, I don't know" (Doc. 43 at 3). Page 72 is not part of the record. Nevertheless, the court has considered Gehrer's testimony because Wichita Electric has not disputed its accuracy.

A. My answer is that, yes, the Hardaway Company, whether it be Bradley Craig or Neil Davis, as a common rule would have directed some of our people to be of any help they could be to Mr. Gehrer, yes, sir.

(Doc. 40, Craig Dep. at 29–30).

Craig also testified that Hardaway's employees were working in their capacity as Hardaway employees and remained on Hardaway's payroll while helping Gehrer. Hardaway never relinquished the right to control or supervise the employees (Doc. 43 at 56, 57, 61).

Neil Davis, a superintendent for Hardaway and Corley's boss, testified that he told Corley, "Pat, whatever [Gehrer] needs or whatever it takes, you know, you help him, or any of the people that he needs" (Doc. 40, Davis Dep. at 30–31). He also testified:

Q. So your instructions to Pat and some of the other men there were to do whatever Gary kind of told them to do, I gather?

A. You know, yes, I mean assistance.

Q. Yeah.

A. In our labeling out there, like we call concrete mud and stuff like that, look, Pat, you help Gary, and any of your people, whatever he needs so we can get back up and running.

Q. Okay. You were essentially kind of loaning Pat to Gary to get the job done?

A. However he could assist, or the people.

(Doc. 40, Davis Dep. at 32).

Corley testified regarding the instructions he received from Davis:

A. No, I—Neal had told me when I come back inside, if you don't know anything about the delta Y, he said don't mess with it, let Gary do it.

Q. Well, if—

A. My men only done what Gary told them to do.

The court is aware that questions regarding employment status generally must be decided by the jury. *Mitzner v. Dept. of SRS*, 257 Kan. 258, 261, 891 P.2d 435 (1995). Nonetheless, when

Q. Sure. And was the same thing true of you, you did some work on the panel—

A. Yeah, I checked—

Q. Were you not supposed to do that?

A. Well Gary was there watching me, he knew what I done.

Q. Your understanding was that if Gary was there and supervising you, then you could do some of the work as long as you did it under Gary?

A. Yeah, I mean he watched—

Q. Okay.

A. —what I done. I asked him before I done it, since Neal had told me not to touch it, I said, "Gary, I'm going to run these three wires, check some of the lugs"—

. . . .

Q. So, in terms of doing the electrical work there in the trailer and on the main control panel, either you—well, any Hardaway employee that was doing any of that work was supposed to do it under Gary's supervision and direction?

A. To my best memory, that's what it was.

Q. Do you remember who told you that, was it Neal?

A. Both of them did; Brad, when he come to me, first told me to let Gary take it over, then when I went inside, Neal told me, he said, "Let Gary have your men, you just leave it alone, you don't know nothing about it."

. . . .

Q. All right. But, in any event, on the day of this accident any work that was being done on the main control panel, either by Mr. Gehrer or you or any of your employees, was done under Mr. Gehrer's supervision?

A. Yeah.

. . . .

the evidence, viewed in the light most favorable to Corley, leads to only one conclusion, a jury trial is not required.

Q. So whatever Mr. Gehrer said went, insofar as working on that main control panel?

A. Yeah.

Q. Okay. You were to follow his instructions period?

A. Yeah.

Q. Okay. And those were the directions you had from your superiors at Hardaway, correct?

A. (Witness nods head in the affirmative).

. . . .

Q. . . . as you have testified, in connection with the repair of this main control panel, you had been instructed to absolutely follow the directions of Mr. Gehrer?

A. Right.

Q. Okay. Now, he couldn't have hired or fired you from Hardaway, but if he had been dissatisfied with your work, would he have had the authority, under your understanding, to tell Hardaway to get you out of there?

A. Oh sure.

Q. And replace you with somebody else to do the work, or something like that?

A. Well, if—like when I was putting them three wires in, if he'd said no, don't touch it, then that was it. I done had my instructions not to touch it.

Q. And so he was in complete authority over that job, is that—

A. Yeah.

(Doc. 40, Corley Dep. at 56, 57, 67, 85–86).

Gary Gehrer, the president of Wichita Electric and the person conducting the repair of the control panel, testified:

Q. Okay. Was there some conversation between Neal Davis and yourself indicating these guys were available for your use during your repair?

A. He told them to do whatever they could, you know, to help, yes.

Q. So were you supervising the other Hardaway employees' conduct with regard to your repair?

A. That's a real gray area. The—they were doing things that I was not aware of, I mean I—they were asking me questions continually—

Q. Uh-huh.

A. —telling stories, talking, I mean—everybody was trying to—they were chasing down lines, saying where does this cable go, you know what does it do, they knew more about the plant than I did, they'd worked on it all the time.

. . . .

Q. Did Neal Davis tell you you could use Hardaway employees to carry out your goal?

A. I still don't know exactly how to answer that, because—I mean he was telling everybody standing in that trailer to do, you know, whatever you needed to do to work on it to get it going, make it function.

. . . .

Q. But who was taking care of the Hardaway employees who were working on the various cables and lines running from this control panel?

A. I would ask them, you know, where does this cable go, yes, I would do that, I'd ask them where does it go from this control panel, this guy would go out. . . . They would trace those out, I had asked the question, well, where does this go, where does it go to, and immediately Neal said, "Trace that damn thing out, find out where in the hell it goes," you know, so they would do that.

Q. So you'd take a cable and at your request the Hardaway employees would follow the specific work tasks with regard to—

A. I would ask them, you know, where does it go, they would follow it and trace it out, yes.

(Doc. 40, Gehrer Dep. at 70–71, 77–78).

Gehrer further testified that Hardaway never told him that he was responsible for the Hardaway employees helping him or that they were working for him (Doc. 43, Gehrer Dep. at 74), and that he didn't think he

specifically asked a Hardaway employee to do a task for him. He stated:

Q. You'd ask where does this cable go and someone would volunteer to—

A. They would take off to go do it, they realized the urgency of getting it back on-line. . . .

(Doc. 43, Gehrer Dep. at 80).

### Standards of Summary Judgment

■■■ Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who 'fails to make a showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Aldrich Enterprises, Inc. v. United States,* 938 F.2d 1134, 1138 (10th Cir.1991) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552). Summary judgment is inappropriate, however, if there is sufficient evidence on which a trier of fact could reasonably find for the nonmoving party. *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 684 (10th Cir.1991).

■■■ The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. This burden, however, does not require the moving party to "support its motion with affida-

vits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original). Once the moving party properly supports its motion, the nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514; *Devery Implement Co. v. J.I. Case Co.,* 944 F.2d 724, 726 (10th Cir.1991). The court reviews the evidence in a light most favorable to the non-moving party, *e.g., Washington v. Bd. of Public Utilities,* 939 F.2d 901, 903 (10th Cir.1991), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

### Contentions of the Parties

Wichita Electric contends that at the time of the accident, Corley had been instructed by Hardaway to perform work for Wichita Electric, making him a "special employee" of Wichita Electric. Wichita Electric moves the court to enter summary judgment in its favor, asserting that Corley's negligence claim is barred because workers compensation was his exclusive remedy. In other words, Wichita Electric contends that it is *not* a third party tort-feasor for purposes of Kan.Stat. Ann. § 44–504(a), *infra.*

■■■ Corley, who does not want to be restricted to his workers compensation award, contends that a jury question exists regarding for whom he was working at the time of the accident. According to Corley:

Plaintiff's testimony was that he was a plant foreman in charge of a number of workmen underneath him. He admits that his superiors informed him to allow his men to work with Gehrer and Wichita Electric Company, Inc. to assist Gehrer in getting the control panel back in working order. He did not admit that his services were lent. He was given specific instructions by Neal Davis, his superior, to not do too much with the electrical work because of his lack of knowledge and experience in this type of electrical panel.

(Doc. 43 at 9). In other words, Corley contends that a jury will decide that *he* remained

Hardaway's exclusive employee, thereby allowing him to proceed against Wichita Electric on his negligence claim.

## Kansas Law[4]

Kan.Stat.Ann. § 44–501(b) of the Kansas Workers Compensation Act provides, "Except as provided in the workers compensation act, no employer ... shall be liable for any injury for which compensation is recoverable under the Workers Compensation Act...." Thus, if an injured worker can recover benefits from an employer under the provisions of the Workers Compensation Act, the worker may not bring a common-law negligence action for damages against the employer. *Dillard v. Strecker*, 255 Kan. 704, 708–09, 877 P.2d 371 (1994) (citations omitted). The provisions of the Act are to be liberally construed to bring workers under the Act whether or not it is desirable for the specific individual's circumstance. *Id.* at 709, 877 P.2d 371. An injured worker may seek to recover workers compensation benefits from a so-called "general employer" or from a "special employer," or both, by application of the "special employee" or "borrowed servant" doctrine. *American States Ins. Co. v. Hanover Ins. Co.*, 14 Kan.App.2d 492, 498, 794 P.2d 662 (1990) (citing *Mendel v. Ft. Scott Hydraulic Cement Co.*, 147 Kan. 719, 724–27, 732, 78 P.2d 868 (1938)). However, the worker may not recover double workers compensation benefits from *both* a general and special employer.

Kan.Stat.Ann. § 44–504(a) permits an injured worker to recover workers compensation benefits from an employer and then seek to recover additional tort damages from a negligent third party, i.e., someone other than an employer. The statute provides:

**Remedy against negligent third party; employer and workers compensation fund subrogated, exclusion; credits against future payments; limitation of actions; attorney fees.** (a) When the injury or death for which compensation is payable under the workers compensation act was caused under circumstances creat-

ing a legal liability against some person other than the employer or any person in the same employ to pay damages, the injured worker or the worker's dependents or personal representatives shall have the right to take compensation under the workers compensation act and pursue a remedy by proper action in a court of competent jurisdiction against such other person.

The Workers Compensation Act does not define the terms "general employee," "special employee" or "borrowed servant." The terms nevertheless have been discussed in numerous Kansas decisions. Some of the cases have involved disputes between two employers over which was liable for workers compensation benefits. *See e.g., Mendel,* 147 Kan. 719, 78 P.2d 868. Others have involved facts more akin to this case: a party being sued under a negligence theory defends on the ground that it was the worker's special employer. *See, e.g., Bright v. Bragg,* 175 Kan. 404, 264 P.2d 494 (1953) (disapproved, in part, in *Bendure v. Great Lakes PipeLine Co.,* 199 Kan. 696, 701, 433 P.2d 558 (1967)).

Corley and Wichita Electric agree that *Bendure* gives the standard for determining whether a "general" or "special" employment relationship exists (Doc. 40 at 7; Doc. 43 at 5). *Bendure* states:

> It is impossible to lay down a rule by which the status of a person performing a service for another can be definitely fixed as an employee, as ordinarily no single feature of the relation is determinative, but all must be considered together and each case must depend on its own peculiar facts. A number of factors have evidentiary value, the most important of which is the degree of control retained by the person for whom the work is being done. In order to determine the actual relationship of the parties under any employment, the courts will look to all the circumstances involved in the particular case. (*Mendel v.*

---

4. In a case in which jurisdiction is founded on diversity, the court applies the law of the forum state. *Essex Ins. Co. v. Vincent,* 52 F.3d 894, 896 (10th Cir.1995). The parties agree that Kansas law applies (Doc. 57, Pretrial Conference Order at 4), and cite to Kansas law in their memoranda.

*Fort Scott Hydraulic Cement Co.,* 147 Kan. 719, 722, 78 P.2d 868).

The test for determining when a relationship of special employer and employee is created is set forth in Larson's Workmen's Compensation Law, 1966, Volume 1A, § 48.00, p. 710, as follows:

"When a general employer lends an employee to a special employer, the special employer becomes liable for workmen's compensation only if

"(a) The employee has made a contract of hire, express or implied, with the special employer;

"(b) The work being done is essentially that of the special employer; and

"(c) The special employer has the right to control the details of the work.

"When all three of the above conditions are satisfied in relation to both employers, both employers are liable for workmen's compensation."

*Bendure,* 199 Kan. at 703–04, 433 P.2d 558. *Bendure* was cited without negative comment in *Thille v. E.L. Farmer & Co.,* 958 F.2d 328, 331 (10th Cir.1992), a case arising in this district.

█ In his memorandum, Corley emphasizes element (a), contending that he did not agree to be a "lent" employee and no contract of hire existed between himself and Wichita Electric (Doc. 43 at 9–10). His emphasis is appropriate because the court finds that the material facts regarding elements (b) and (c) are undisputed.

As to element (b), the undisputed facts show that repairing the control panel was essentially Wichita Electric's work. Hardaway hired Wichita Electric to repair the control panel and it was Wichita Electric's responsibility to get it done. The repair involved electrical wiring which was within Wichita Electric's area of expertise and Hardaway's employees lacked the knowledge to conduct the repair themselves.

Element (c) deals with whether Wichita Electric had the right to control the details of the repair work. It is undisputed that Hardaway ceded to Wichita Electric the right to control the details of the work surrounding the control panel. If Hardaway's employees could have repaired the control panel, Wichita Electric would not have been called in. Davis and Craig consistently testified that Hardaway directed its employees, *Corley included,* to absolutely follow the instructions of Gehrer. Corley knew and accepted these instructions. Corley repeatedly testified that Gehrer was in charge of the panel repair work and that he understood he was to absolutely follow Gehrer's instructions.

The facts that Corley remained on Hardaway's payroll and that Hardaway, not Wichita Electric, had the power to discharge Corley are not relevant to element (c) because the focus is on the narrower confines of the control panel repair job. In other words, the focus is not on the taxiway project, where Hardaway clearly retained the right of control, but rather on the repair to the control panel, the "work" out of which the injury arose.

This leaves element (a): whether Corley made a contract for hire, express or implied, with Wichita Electric. There is no evidence of an express contract. Wichita Electric's position is that "an implied contract was made ... when Hardaway management specifically instructed Corley to assist Gehrer in the repair in whatever manner was needed and Corley assisted Gehrer as directed" (Doc. 40 at 8–9). Wichita Electric contends that the existence of an implied contract can be inferred from these facts, relying upon *Bright v. Bragg.* Briefly stated, appellant Bright was an employee of intervenor Advance Furnace Company, which had contracted with appellee Bragg Furnace to deliver loads of sheet metal to Bragg's place of business. 175 Kan. at 405, 264 P.2d 494. Bright was injured when the sheet metal was being stacked during one of the deliveries. The Kansas Supreme Court noted:

After the second load had been delivered appellee concluded there would be insufficient room to stack the third load in the workshop and he so notified appellant. It thus became necessary for appellee to find a place to put the third load. Appellee's supervisor agreed to select such a place by the time intervenor's employees arrived with the third load. He did so. The entire process of unloading and stacking the

three loads of metal was performed precisely as though it was understood by all that the unloading and stacking under appellee's direction constituted a part of the delivery. No question to the contrary was ever raised. In fact after the first two loads had been unloaded at a place selected by appellee and stacked in accordance with his directions the intervenor believed an additional man should be sent along to assist with the third load of approximately 110 sheets of metal. Intervenor, therefore, instructed appellant to take a third employee along. Under these circumstances we shall not say appellant's evidence did not reasonably disclose an understanding that sale and delivery included unloading and stacking. *Surely we would not deny a claim for compensation, if one had been filed by appellant against appellee, on the ground no contract for unloading and stacking had been shown under the instant record. Our compensation act does not require an express contract. The conduct of the parties clearly disclosed an agreement of the parties that intervenor's workmen would at least assist in the unloading and stacking of the metal. Moreover they freely did so at a place selected by appellee and in the manner directed by him.*

*Id.* at 408–09, 264 P.2d 494 (underline in original). The italics, provided by this court, indicate the language on which Wichita Electric presumably relies for support of its implied contract agreement.

There is a problem with unquestioned reliance on this portion of the opinion. In the two paragraphs immediately preceding the aforesaid quote, the court noted that Bright, the injured party, argued there was no contract for the work out of which his injury arose. *Id.* at 408, 264 P.2d 494. The court apparently rejected that argument on the basis that something had to be done with the pieces of sheet metal after they were delivered to Bragg's shop and that a proper delivery was implied in the contract between Advance Furnace Company, Bright's employer, and Bragg Furnace Company, to whom the sheet metal was delivered. The court then proceeded to the quoted portion which, now placed in perspective, simply says that the

circumstances of the contracted-for delivery implied unloading and stacking, the activity which injured Bright. Thus, the implied contract being discussed by the court was one between Advance Furnace, Bright's employer, and Bragg Furnace—*not* Bright and Bragg.

There is another problem with direct application of *Bright* to this case. It seems clear from reading the opinion that the court made no clear distinction between Kan.Stat.Ann. § 44–503, which deals with subcontractors or so-called "statutory employees" and § 44–504. This is alluded to in the opinion itself where the court notes: "Appellant, however, argues there was no contract for unloading and stacking and hence there can be no recovery of compensation for appellee under G.S.1949, 44–504. He probably intended to refer to G.S.1949, 44–503. . . ." 175 Kan. at 408, 264 P.2d 494. It also is evident from the later opinion in *Bendure* where the court *specifically disapproved Bright's* conclusion that because of the contract between Advance Furnace and Bragg Furnace, Bright was entitled to worker's compensation as though he had been employed by Bragg. *Bendure* disapproved this conclusion "for the reason the relationship between [Advance and Bragg] was that of vendor and vendee, not that of principal and contractor as the term is to be understood in K.S.A. 44–503." *Id.* at 705, 433 P.2d 558.

For these reasons, the court is reluctant to place unreserved reliance upon *Bright v. Bragg* for the proposition urged by Wichita Electric.

■ This is not to say that a contract between the injured worker and the special employer cannot be implied. It can be. Larson's description of the problem is helpful:

### § 4811 Cases on necessity for contract with special employer summarized

Although the lent-servant doctrine is a familiar one at common law, and has produced some of the most venerable and most intricate cases in the law of master and servant, it is necessary to stress once more that the workmen's compensation lent-employee problem is different in one

significant respect: There can be no compensation liability in the absence of a contract of hire between the employee and the borrowing employer. For vicarious liability purposes, the spotlight was entirely on the two employers and what they agree, how they divided control, how they shared payment, and whose work, as between themselves, was being done. No one paid much attention to the employee or cared whether he had consented to the transfer of his allegiance, since, after all, his rights were not usually as a practical matter involved in the suit. In compensation law, the spotlight must now be turned upon the employee, for the first question of all is: Did he make a contract of hire with the special employer? If this question cannot be answered "yes," the investigation is closed, and there is no need to go on into tests of relative control and the like.

### § 4812 Reason for necessity for informed consent by employee

This must necessarily be so, since the employee loses certain rights along with those he gains when he strikes up a new employment relation. Most important of all, he loses the right to sue the special employer at common law for negligence; and when the question has been presented in this form, the courts have usually been vigilant in insisting upon a showing of a deliberate and informed consent by the employee before employment relation will be held a bar to common-law suit.

### § 4813 Special employer test as essentially similar to basic employment test

In one sense, the lent-employee doctrine is not a separate doctrine at all. Theoretically, the process of determining whether the special employer is liable for compensation consists simply of applying the basic tests of employment set out earlier in this chapter. If they are satisfied, the presence of a general employer somewhere in the background cannot change the conclusion that the special employer has qualified as an employer of this employee for compensation purposes.

### § 48.14 Presumption of continuance of general employment

What gives the lent-employee cases their special character, however, is the fact that they begin, not with an unknown relation, but with an existing employment relation. The conflict of interest becomes one not between employer and employee (who is assured of recovering from someone) but between two employers and their insurance carriers. There is here no place for presumptions based on the beneficent purposes of the act. The only presumption is the continuance of the general employment, which is taken for granted as the beginning point of any lent-employee problem. To overcome this presumption, it is not unreasonable to insist upon a clear demonstration that a new temporary employer has been substituted for the old, which demonstration should include a showing that a contract was made between the special employer and the employee, proof that the work being done was essentially that of the special employer, and proof that the special employer assumed the right to control the details of the work; failing this, the general employer should remain liable.

### 48.15 Consent to special employment implied from acceptance of control

The necessity for the employee's consent to the new employment relation stems, of course, from the statutory requirement of "contract of hire," discussed in the preceding section. The consent may be implied from the employee's acceptance of the special employer's control and direction. But what seems on the surface to be such acceptance may actually be only a continued obedience of the general employer's commands. For example, when a general employer told claimant to help the employer's friends get a motorboat started, claimant's temporary compliance with the friend's directions was held to be nothing but the carrying-out of the general employer's initial instructions.

IB Larson's Workmen's Compensation Law §§ 48.11–48.15 (1994) (footnotes omitted).

A review of the cases cited in § 48.15 provides no bright-line test for resolving

whether an employer and employee have an implied contract of special employment. The two more recent Kansas decisions which address the "special employee" doctrine do not provide a specific test. *See Belger Cartage Service, Inc. v. Holland Construction Co.,* 224 Kan. 320, 582 P.2d 1111 (1978) and *Bright v. Cargill, Inc.,* 251 Kan. 387, 837 P.2d 348 (1992). *Bright* does counsel, however, that "where reasonable minds could differ, the determination of whether 'loaned' employees become the employees of the borrower was left to the trier of fact." 251 Kan. at 406, 837 P.2d 348.

### Conclusion

In this case, a dispute of material fact exists regarding whether Corley had an implied contract with Wichita Electric. A jury will have to resolve this dispute. It will *not* have to decide elements (b) and (c) of the *Bendure* test, *supra,* because the court has resolved those issues as a matter of law.

Pursuant to the Fed.R.Civ.P. 42(b), the trial will be bifurcated. In the first portion of the trial, the jury will hear evidence pertaining solely to the implied contract issue. If the jury decides that an implied contract of special employment existed between Corley and Wichita Electric, the case will be over. *See Bendure,* 199 Kan. at 703, 433 P.2d 558. If the jury reaches the opposite conclusion, the case will proceed with presentation of evidence on liability, comparative fault and damages. Stated another way, during the first phase of the trial, the jury will not be told of the effect of its verdict in terms of allowing or disallowing a negligence case to proceed against Wichita Electric, nor will injuries or damages be mentioned.

No later than November 14, 1995, the parties shall file motions in limine and proposed instructions. The court is particularly interested in instructions on the implied contact issue annotated with PIK or case references.

Accordingly, Wichita Electric's motion for summary judgment (Doc. 39) is granted in part and denied in part.

IT IS SO ORDERED.